No. 24,944.

RALPH HIGH, *Appellee,* v. THE A. J. HARWI HARDWARE COMPANY et al., *Appellants.*

### SYLLABUS BY THE COURT.

LIBEL—*Discharged Salesman of Hardware Company—Letters Stating Defamatory Reasons for Discharge of Salesman—Privileged Communications.* The evidence in an action for libel considered, and *held,* a letter written by a wholesale hardware company, to be shown to its customers in a certain territory, stating defamatory reasons for discharge of its former traveling salesman in that territory, related to a subject of mutual interest to the company and its customers, and was conditionally privileged; the privilege was not lost by showing the letter to customers voluntarily and not in response to inquiries respecting the matter; and exhibition of the letter to a customer's clerk was incidental to a proper publication for protection of the company's interest.

Appeal from Reno district court; WILLIAM G. FAIRCHILD, judge. Opinion filed February 9, 1924. Reversed.

*Z. E. Jackson,* of Atchison, *A. C. Malloy, R. C. Davis,* and *Warren H. White,* all of Hutchinson, for the appellants.

*C. M. Williams,* and *D. C. Martindell,* both of Hutchinson, for the appellee.

The opinion of the court was delivered by

BURCH, J.: The action was one for libel. Plaintiff recovered, and defendant appeals.

Plaintiff, who resided at Hutchinson, was an employee of the defendant, a wholesale hardware company, for about twenty-one years, and from 1908 until he was discharged in January, 1922, was a traveling salesman in what was known as territory No. 4. He also had authority to collect from customers. While the company denied he had authority to indorse checks made payable to its order, he claimed he sometimes did so. Sometimes he would send checks he received from customers in payment on account, direct to the company. He testified that sometimes, while on the road, he would procure drafts with customers' checks, and send the drafts to the company, and sometimes he would deposit the checks in his own account in his home bank, and send in drafts. He indorsed all checks he did not send to the company. Skalsky Bros., at Belpre, were customers of the company, and for two or three years previous to his discharge plaintiff made all collections from them. During the year

1921, the state of the Skalsky account was not satisfactory to the company. Plaintiff asked permission to handle it, and was allowed to do so. Because remittances were small and few, the company charged interest on the account, and in December the company claimed Skalskys owed $1,328.46. On December 27 the company sent Skalskys an itemized statement of account, starting with a small balance on March 1, 1918. On December 28 the company was astounded when it received the following telegram:

"You have us credited with $7,261.43. We paid you $12,126.83. We have the cancelled checks to verify our statement."

During the period covered by the statement, the total sales to the Skalskys amounted to only $8,589.59, and plaintiff had received from them checks for not only the balance due the company on their account, but nearly $4,000 besides. The telegram brought matters to a quick culmination. Plaintiff, who was in the company's office when the telegram was received, was sent to Belpre to see what was the matter with the account. He went there, came back, made a report, and was discharged.

On January 12, 1922, Elmer B. Gray, who lived at Wichita, was appointed salesman for the company in territory No. 4. The sudden discharge of plaintiff and the appointment of Gray were subjects of interest to hardware salesmen and dealers in the territory plaintiff had covered for so many years. Customers of the company wanted to know of Gray why the change had been made, and some were insistent. An implement dealers' convention was held in Kansas City, Mo., extending from January 16 to 19, 1922. Plaintiff attended this convention, and the fact he no longer represented the company was a subject of discussion there. Salesmen for the company's competitors talked freely about it in territory No. 4. Opinions unfavorable to the company were formed, and their trade was threatened, because customers believed the company had treated plaintiff badly. Gray informed the company of conditions in the territory, and on January 24, 1922, the company sent him the following letter:

"It is only natural that a great many of our friends and customers on your territory will be desirous of knowing why Ralph High is no longer with the company. This was explained to you when you were here at the house, but we felt that it would be better to give you this information in letter form so that you will have it to show to any of our friends who want to know the truth. Ralph High was discharged from the service of the company for dishonesty,

he has confessed to collecting money from at least one account amounting to thousands of dollars, and the money in question was not turned in to the house, nor is he in position to make it good at the time this is being written. It is a case of confession to not one act, but of repeated acts. When we discovered this, we immediately cancelled his contract. You are requested to show this letter to any one interested in the case."

Gray showed the letter to several persons before it was captured by plaintiff on February 20, under the following circumstances, as related by Gray:

"I was calling on the Zimmerman Hardware Co., and Mrs. Zimmerman was asking me practically every time I went in there what the difficulty was; she asked me again, and I showed her the letter; handed it to her. She asked me if I knew, and I said, 'This letter will explain.' Mrs. Zimmerman read the letter, and asked me if she could call. Mr. Zimmerman and show it to him. I said certainly. Mrs. Zimmerman called Mr. Zimmerman, and he came in, took the letter and glanced at it, and started to read it. He had read it about half way through when he hallooed for Ralph High, and Mr. High came in, and Mr. Zimmerman handed the letter to Mr. High. Mr. High put the letter in his pocket, and the four of us had a half hour's discussion pro and con, and that was the end of the letter so far as I was concerned."

The action was predicated on publication of the company's letter. The company pleaded truth of the statements contained in the letter, and pleaded the privileged character of the communication. The verdict in favor of plaintiff was for $15,000.

That plaintiff was discharged for dishonesty; that he collected several thousand dollars on the Skalsky account; that the money was not turned in to the company; that he was not able to make good his appropriation of the company's funds at the time the letter was written; and that his appropriation consisted not of one but of several acts—cashing seven checks given him by the Skalskys between June 16 and November 30, ranging from $100 to $500—were facts proved so incontestably that, if the jury found to the contrary, it did not deal competently with the evidence.

The record contains the correspondence between plaintiff and the company, beginning in January, 1921, and extending to December 1, relating to the Skalsky account, and revealing shocking duplicity on the part of plaintiff. The company requested collection of the account, urged collection, commanded collection, pleaded for collection, threatened to sue on the account, and in October wrote plaintiff that if it lost anything on the account the loss would be charged to him. It seems the Skalskys kept no books except a daybook, and time and again plaintiff besought the company to leave collection of

the account to him, and not to send statements to the Skalskys. Excuse followed excuse for not collecting the account. On occasions when the company did send statements of the acount to the Skalskys, plaintiff reprimanded the company for doing so. The company kept furnishing the plaintiff with statements of the account, which failed to show credits amounting to much more than the entire account. On November 3, plaintiff wrote the company as follows:

"Now just sit steady in the boat and I will collect the Skalsky account as I have promised.

"Their business isn't closed out yet, and won't be before the first of the year. Did you ever have a check go to protest from Skalsky Bros.? Why is it that you think the $220.12 check I send in will?

"I will see them next week or a few days after.

"Don't lose any sleep over this, as I know exactly where I am at in the matter."

No inquiry for missing credits was ever made, but on December 17, plaintiff introduced the subject of some old invoices which were missing, in the following letter:

"Don't let the Skalsky account worry you. If I don't get this straightened up before the first of January, I will right after the first.

"I want to get a copy or duplicate of a few invoices we shipped them in 1919.

"They seemed to have lost their invoice, and as soon as I get these, when I come there they will pay me in full as I have told you before.

"Just leave it to me, and I will get this all straightened up."

Plaintiff testified that when he went to Belpre in January, 1922, after the company and the Skalskys had begun dealing directly with each other, he checked up and added up the cancelled checks that Skalskys had given him. Of course the endorsements showed whether they had been sent to the company or not, and if he had cashed them, at what bank, but he made no attempt to trace the money through either checks or drafts. When he returned he gave the company a statement of the amount of the checks he had received, showing they amounted to $3,739.45 more than the account. A portion of plaintiff's version of his interview with the president of the company on his return reads as follows:

"Q. Well, what did he say? Tell us what he did say as near as you can. A. Then I will say that I came in, went into his office, and told him that I couldn't make the collection. He said, 'What did you find out about it?' and I told him they claimed they had paid it, and that they wouldn't pay it again, and he said, 'They say they have paid it.' He said, 'It is a cinch I didn't get it, and will hold you good for it.'

"Q. Did you show him these figures? A. Yes, sir.

"Q. When did you show him these figures? A. During the time; I don't. remember.

"Q. Tell it all, as you recollect it. A. Then he said he would hold me good for it, and I told him I couldn't pay it. 'Well,' he said, 'I don't care who pays it, you ————. Skalsky will pay it, or you will have to.' So he said, 'How did it figure up?' So then he was arriving at ————, then I was arriving at what ———— I believed he was holding me to pay, and we came at these figures here."

On February 20, 1922, Skalskys, not the plaintiff, sent the company a check for $1,328.46, to settle their account. On receiving the check the company returned to Skalskys $91.07 interest which the company had added to the account for the year 1921, under the belief its agent, the plaintiff, had not been able to collect. On February 9, 1922, plaintiff gave to Skalskys a mortgage on lots in Hutchinson, which on January 4 he had deeded to his wife, to secure a note to the Skalskys for $4,815.70, due in six months. The Skalskys destroyed the checks, plaintiff changed banks, and his own bank book, cancelled checks, and check stubs, could not be found when the case was tried.

Against this overwhelming proof of guilt there stood nothing but plaintiff's assertion that he sent to the company all the payments the Skalskys had made, implying the company owed Skalskys nearly $4,000 overpayment on account.

The president and the credit man of the company testified plaintiff confessed his peculations to them, giving the conversations and the circumstances under which they occurred. Plaintiff corroborated them as to the circumstances and as to portions of the conversations, and had difficulty in steering clear of admitting the confessions themselves. He testified he collected the money, told the president he had no way of disputing the books, wanted to pay him, did not have the money, meaning he could not pay it, and asked to go back to work for the house so he could pay it. He testified further as follows:

"In this conversation Mr. Harwi said, 'If they [Skalskys] claim they paid it, it is a cinch I didn't get it.' He said I must have got it. I admitted then, if they claimed they paid it, and their books showed they didn't get it, I admitted it could look to him that that was the situation."

He also testified as follows:

"On September 10, 1921, I wrote to Mr. Raterman [the company's credit man] telling him that I would collect from Skalskys the coming week, and

asking him not to send them statement or write them on the 15th, that I was going to collect in full from them.  At that time, according to their statement, I had collected the account in full, and more too."

It will be remembered that proof he had collected the money lay in checks endorsed and cashed by him, returned cancelled to the Skalskys, and checked up and footed up when he went to Belpre to straighten out the matter; and if in November he knew exactly "where he was at," he knew where he had been buying drafts, if he remitted by draft.  With reference to what occurred on his return from Belpre, he gave the following peculiar testimony:

"Q. Did you go back after you had learned this situation in checking up, and make demand upon the Harwi Hardware Company to straighten this matter out with the Skalsky Brothers?  A. I went back and reported it; yes.

"Q. Did you make a demand on them to straighten up with Skalsky Brothers for any overpayments that they claimed?  A. I went back and told him I could not collect it.

"Q. Did you tell him that they claimed they had overpaid you $3,700 in addition to paying the account?  A. I told him they had overpaid, yes.

"Q. Did you claim then to the Harwi Company that it had been turned in to them, and they would have to straighten it up with the Skalsky Brothers?  A. They said to me that it had not been turned in to them.

"Q. What did you say to that?  Did you tell them it had?  A. I said I had collected it; Skalsky claimed they had paid it, and I collected it, and if their books showed I did get it, then I said as I was collector it looks so then that I did get it.

"Q. Is that all the demands you made on them?  A. Yes."

Elsewhere in his testimony plaintiff made categorical denial of every statement by way of confession attributed to him by the president of the company and its credit men; but what he says he said was, under the circumstances, fairly open to interpretation as a confession.

In this state, truth of a defamatory statement complained of as libelous is a complete defense in a civil action.  (*Castle v. Houston*, 19 Kan. 417; *Klover v. Rugh*, 99 Kan. 752, 756, 162 Pac. 1179.)  As indicated, there was some testimony in opposition to truth of the statements contained in the letter, and this court, not possessing the power of the district court, is bound by the finding of fact adverse to defendant contained in the verdict of the jury.  The foregoing presentation of evidence is to be regarded, therefore, as an introduction to the subject of privilege.

After he succeeded plaintiff, Gray made a trip over the territory. Most of the company's customers asked why plaintiff had quit, but

Gray discussed the subject with only two. Gray testified as follows:

"I went to Ralph Culley's store at Preston. One of the Culleys of the Greensburg Implement Co. was in the store, and asked me about it, and I told him I did not know anything about it. After Mr. Ralph Culley got through waiting on customers he said to me, 'My father has bought hardware from Harwi for years,' and he said, 'we boys,' meaning himself and Roy at Greensburg and Mr. Culley at Mullinville, 'are all friends of Mr. High. I know that you know why Mr. High left Harwi's employ, and I want you to tell me, and I don't want no lie about it'."

Culley testified as follows:

"Q. Tell us what traveling men you did talk with about that, or about the circumstances of High leaving the employ of the Harwi Company. A. That was talked about by nearly every traveling man that came in there for several weeks after the first of the year, and it would be pretty hard to name all of them.

"Q. Was it talked of before Mr. Gray came on that territory, or called on you at any rate? A. Yes, sir.

"Q. You don't recall any of the conversation with these traveling men, repeating things Mr. High had said to them? A. No, sir, not that Mr. High had said to them, because I was hearing so much, and I don't remember whether they said Mr. High told them, or where they got this information.

"Q. That was the general subject of talk at that time? A. Yes, sir.

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"I came to the conclusion to make a direct inquiry of the house, and learn what the facts were, and wrote a letter to the house and asked them to state the facts, and received a letter from them in reply which purported to state the facts; I told them I thought my father, who was engaged in business at Mullinville, ought to know it."

The other customer with whom Gray discussed the subject, Mr. Rouse, of Lewis, said some other salesmen were in his store, and one of them said High had quit Harwi because of a cut in salary and expense account. A number of traveling salesmen for hardware houses called on him in January, and he was sure he had a conversation with some one giving him an impression why High quit. When Gray called on him, he withheld judgment, because "he had heard it two ways."

On his second trip over the territory, customers made inquiries of Gray. He reported the fact to the company, received the letter, and had it with him the last half of his second trip.

Oliphant, of Offerle, had been a customer of the company since 1913. He attended the implement dealers' convention at Kansas

City, and the subject of High's leaving the company was discussed between salesmen and dealers. Afterwards he talked with Couchman about the matter. Couchman was once an employee of the company, lived at Hutchinson, and was a friend of High. After he was discharged, High made a trip over territory No. 4, calling on former customers to solicit life insurance. He traveled with Couchman. Couchman gave Oliphant the following explanation of High's discharge:

"I guess Mr. High quit for the same reasons I did. They cut our salary and commission, and we left."

Rouse, of Lewis, testified as follows:

"I saw this letter on Gray's first call on me. I had heard about the trouble before I saw the letter. It was just talk among the various salesmen. Can't call to mind who they were. Substance of the talk was rumor to the effect that High had resigned on account of commission troubles; or adjustments with the house, adjustments of commission due by the house to High."

Rouse further testified that, on the occasion of Gray's visit, one of his clerks was talking to Gray, and Gray asserted High was discharged for dishonesty. Rouse said he did not believe Ralph High would do a stunt like they claimed he had. His testimony continues as follows:

"He handed it [the letter] to this clerk, H. K. Israel. He read it and handed it to me, and I read it. I had not asked for it at that time. I was present when the letter was handed to the clerk. He asked for it in a way. Gray asked him if he wanted to see the letter. He said he would like to see it, and Gray produced the letter."

M. M. Rummell, of Kinsley, an old customer of the company, testified as follows:

"Mr. Gray called on me. I do not remember that I told him that I was through dealing with that house; I would not say for sure. There was so much conversation and so much talk, I do not believe I could say for sure. I have bought three bills of goods since; nothing in comparison to what I used to buy.

"Q. Why did you quit dealing with them? A. Well, Mr. High was a very personal friend of mine.

"Q. Any other reason? A. None that I can think of at the present time.

"Q. You mean that the dealings you had with the house were on Mr. High's account, and not on account of the house? A. Well—

"Q. And Mr. High having quit the house, you did not care to deal with the house? Is that what you mean? A. Well, to a certain extent; yes, sir.

"Q. You thought Mr. High had been mistreated, didn't you, by the house? A. Why, yes."

The court instructed the jury as follows:

"The court instructs you that a communication which would otherwise be libelous and actionable, if made in good faith and without malice in fact upon a matter involving an interest or duty to the party making it to a person having a corresponding interest or duty, then said communication would be privileged. And I instruct you in this case that if the defendants wrote and published said letter in good faith and without malice in fact in answer to inquiries from customers of defendants as to why plaintiff was no longer in the employ of defendants, and that the publication and circulation of said letter was only intended for and only published to such customers in answer to such inquiries by such customers, then the writing and publishing of said letter would be privileged; but the defendants would not be entitled to this privilege if they voluntarily and without solicitation published or showed said letter to its customers, or if it showed said letter to others than its customers.

"I instruct you further that the defendants would not be entitled to this privilege if said letter was written and published for the purpose of counteracting rumors, though said rumors may be false, as to why the plaintiff was no longer in the employ of the defendants."

In another instruction the court limited rightful publication to such customers only as inquired why plaintiff was no longer connected with defendant. The first part of the instruction was correct. The limitations placed upon it were erroneous and, as applied to the testimony outlined above, were necessarily prejudicial.

Plaintiff had been the means of personal contact between the company and its customers for many years, meeting and parting with them in their places of business, supplying their needs, receiving and remitting their money, and maintaining the friendly relationship which is indispensable to successful trade. When he was discharged, the company sent its customers in territory No. 4 the following letter:

"We are pleased to announce that we have engaged Elmer Gray to succeed Ralph High on the territory in which you are situated. Owing to circumstances which are beyond our control, we found it necessary to cancel our contract with Mr. High.

"Elmer Gray is an experienced hardware salesman, and has been identified with the wholesale hardware business in Wichita and adjacent territory for many years. He and we shall put forth our best efforts to serve you faithfully and well, and we hope that you will continue to favor us with your orders as you have in the past."

Very soon after his discharge, it became apparent that not only the company's reputation for fairness, but the trade which plaintiff had built up for it, were threatened for lack of authentic information on the part of customers as to why plaintiff no longer repre-

sented the company. The rule of law applicable to the facts is stated in Newell on Slander and Libel, 3rd ed., § 607, as follows:

"A defamatory communication when necessary to protect one's own interests is privileged, when made to persons who also have a duty or interest in respect of the matter." (p. 614.)

Sometimes difficulty is encountered in determining who besides the person making the communication has a proper interest in the matter. There are familiar classes, members of church and fraternal societies, stockholders of a corporation, etc. No case closely analogous to this one in its facts has been cited to the court, but the list of classes is not closed for that reason. Satisfactory business relations between wholesale dealer and customer, maintained by mutual good will, confidence, and understanding, are not merely desirable, but are valuable to each. When those relations are likely to be disturbed, strained, or broken, on account of lack of knowledge or of misinformation on the part of the customer of the cause of an incident directly affecting the relationship, dealer and customer have a mutual interest in the matter. The dealer, knowing the facts, may voluntarily communicate to the customer a statement of the cause; and the statement is privileged, if made in good faith, with belief in its truth and without malice, even although it be untrue, and defamatory to a third person. The circumstances are such as to preclude any presumption of malice, and to put the person claiming to have been defamed upon affirmative proof of both falsehood and malice. (*Richardson v. Gunby*, 88 Kan. 47, 50, 127 Pac. 533.)

If what did occur had been sooner foreseen, the company might have stated High was discharged for dishonesty in the letter to customers announcing Gray's appointment.

When Gray went to Rouse's store, the staple topic of conversation was inevitably canvassed. The discussion began with a member of Rouse's force, his clerk, and the letter was shown to the clerk, and then to Rouse. The letter was produced, however, in response to Rouse's challenge of Gray's assertion High had been discharged for dishonesty. Therefore, publication to the clerk was an incident to proper publication for protection of the company's interest.

"The communication appears to have been made in good faith, and manifestly for members of the denomination alone. As has been seen, it was published only in church papers, and the fact that the publication may have incidentally been brought to the attention of others than members of the Church,

of Christ will not take away its privileged character. In *Toogood v. Spyring,* 1 C. M. & R. 180, it was held that publication made in good faith in discharge of a public or private duty are protected for the common convenience and welfare of society, and that the law does not restrict the privilege within any narrow limits. It was further remarked: 'I am not aware that it was ever deemed essential to the protection of such a communication that it should be made to some person interested in the inquiry, alone, and not in the presence of a third person.'" (*Redgate v. Roush,* 61 Kan. 480, 485, 59 Pac. 1050.)

The judgment of the district court is reversed, and the cause is remanded for a new trial.