Kerry **CASTLEBERRY**, and
John **Melton**, Plaintiffs,

v.

The **BOEING COMPANY**, Defendant.

No. 93–1375–PFK.

United States District Court,
D. Kansas.

March 9, 1995.

Jack Focht and Laura B. Shaneyfelt, of Focht, Hughey & Calvert, Wichita, KS, for plaintiffs.

Mary Kathleen Babcock and Richard D. Ewy, of Foulston & Siefkin, Wichita, KS, for defendant.

## MEMORANDUM AND ORDER

PATRICK F. KELLY, Chief Judge.

This matter comes before the court on the motion for summary judgment by the defendant, The Boeing Company. A hearing was held on February 22, 1995, and the court now is ready to rule.

Plaintiff Kerry Castleberry worked for Boeing from April 1979 until August 1982 and from January 1984 until his discharge in August 1992. Castleberry was a first-level manager from 1984 until 1990 and a second-level manager from 1990 until his discharge. Plaintiff John Melton worked for Boeing from March to October 1976 and from May 1979 until his discharge in August 1992. Melton was a first-level manager from 1985 until his discharge.

On July 30, 1992, Eileen Barr, a nonmanagement employee, spoke to Melton concerning the birthday celebration to be held the next morning for Sandy Koester, another nonmanagement employee. Barr wanted to give Koester a dildo as a gag gift, but did not have time to purchase it because of her working schedule. Barr offered to reimburse Melton if he would buy the dildo, and Melton agreed. He said nothing to Barr about the appropriateness of such a gift for an activity held on company property. Melton purchased the dildo and brought it to work the next morning, placing it in a desk drawer. When Barr telephoned Melton to confirm the purchase of the gag gift, Melton did not mention the appropriateness of the gift.

The birthday party was held in the conference room in Castleberry's office area. All employees present were managers with the exception of Barr and Koester; all first-level managers reporting to Castleberry, which included Melton, and one third-level manager, Kurt Richardson, were present; the only women present were Barr, Koester, and one first-level manager. Barr and Melton met outside the conference room, and Melton handed Barr a paper sack containing the dildo. Barr and Melton walked into the conference room, and Barr handed Koester the sack. Barr said something to the effect, " 'We know what you're going through with the divorce and we got you something we thought might help.' " (Def.'s Memo., Fact No. 13; Pltfs.' Response at 13.) Koester peered into the sack and chuckled. She lifted the dildo partially out of the sack only after someone asked to see it. Melton described his embarrassment and discomfort in purchasing the gag gift.

Castleberry saw that the gift was a dildo. He walked over to Koester, and she handed the paper sack to him upon request. Castleberry displayed the dildo and read aloud the package blurb, which described the contents as a "vibrating cock." (Def.'s Memo., Fact No. 15; Pltfs.' Response at 13.) When Castleberry noticed an employee entering the conference room, he hid the dildo behind his back in case the individual entering was an hourly employee whose involvement was not needed; the entering employee was another first-level manager. Castleberry compared his anatomy with the dildo and made some comment such as " '[t]his looks familiar.' " (Def.'s Memo., Fact No. 15; Pltfs.' Response at 14.) According to Castleberry, everyone in the room was laughing. Neither the gift nor its presentation offended Koester and Barr. After a total of three or four minutes, Castleberry returned the dildo to Koester and told her to put it away for the remainder of the day.

Two months prior to the dildo incident, in June 1992, Boeing conducted a one-hour compulsory seminar for managers. The seminar concerned sexual and racial harassment and was designed to ensure there were no misunderstandings concerning the elements of harassment. Presenters included top Boeing management personnel, including the vice president/general manager, the operations director, the EEO manager, and the deputy general counsel. Castleberry and Melton attended the seminar.

The seminar left Castleberry with the impression Boeing was serious that managers ensure their actions not be construed as sexual harassment. The seminar reinforced Castleberry's understanding it is not proper to have sexual gadgets in the workplace. He considered a dildo to be an explicit sexual object.[1] Melton recalled from the seminar that it was not acceptable or proper to have sexual gadgets or explicit sexual items in the workplace. He considered a dildo a sexual gadget or explicit sexual item. Melton understood from the seminar he was to report the observance of any suggestive or explicit sexual gadgets or items. One of the view graphs shown at the seminar, which Melton recalled seeing, stated, "Don't allow sexually suggestive or explicit pictures, posters, calendars, etc. in the workplace." (Def.'s Memo., Fact No. 6; Pltfs.' Response at 8–9.)

Immediately following the birthday party, Richardson spoke with Castleberry and expressed concern about the circumstances involving the dildo. Castleberry stated he would inform first-level managers no dildo or sexual object should be brought to the workplace. With Castleberry in agreement, Richardson reported the incident to the area personnel support representative, Terry Jones. Meeting later that day with Castleberry and first-level managers who attended the party, Jones and others emphasized the gift was inappropriate, instructed the managers never to condone or participate in such conduct, and directed them not to discuss the matter.

Michael Bailey, a Boeing EEO manager, initiated an investigation. As an EEO manager, Bailey processed external and internal discrimination complaints. He evaluated fact scenarios, reassessed material compiled during the investigation, and made recommendations on action to be taken. If Bailey discovered a violation of company policy, apart from a violation of discrimination laws, he reported it to the proper channels. During his investigation, Bailey learned one or two complaints about the birthday party had been registered with the corporate ethics office in Seattle. The facts gathered in the investigation were similar to the account just set forth. The major exception being that some employees at the party stated Castleberry grabbed his crotch when he was in possession of the dildo. Castleberry has denied same. For purposes of this motion, the court accepts Castleberry's account.

The matter was referred to Richard D. Rader, Boeing's discipline coordinator. Rader's responsibilities included ensuring discipline was administered consistently and in compliance with company guidelines and rules. Rader characterized the plaintiffs' conduct as inappropriate. He considers managers to be leaders who set examples for the employees under their supervision.[2] By

---

1. Castleberry moves to strike the following sentence: "Castleberry understood it was improper to have sexually explicit objects, such as a dildo, in the workplace." (Def.'s Memo., Fact No. 8.) The plaintiff maintains "the supposed factual statement is a misstatement of the law of sexual harassment and objects that it is an invalid, inappropriate and inaccurate legal conclusion." (Pltfs.' Response at 9.) Evidently, Castleberry is contesting the characterization of a dildo as a sexually explicit object. This court denies the motion to strike, finding the plaintiff's argument without substance.

2. The plaintiffs move to strike Defendant's Fact No. 31, but fail to explain what should be struck. They concede Rader depicted their conduct as inappropriate. They agree Rader stated managers set examples for employees under their supervision, but suggest the statement is controverted based upon the testimony of Clark Nebeker, corporate discipline coordinator, and Robert Staples, director of operations. According to the plaintiffs, Nebeker said managers and employees were to be "treated the same" for disciplinary purposes, and Staples stated Boeing has no written policy authorizing managers to be treated differently from nonmanagerial employees. (Pltfs.' Response at 22–23.)

Nebeker did not testify that managers or supervisors and employees were to be treated the same. The testimony upon which the plaintiffs rely follows:

not stopping the activity, employees could perceive the managers as condoning the activity.

Rader conferred with the corporate discipline coordinator, but neither identified an incident involving managerial conduct similar to the conduct of Castleberry and Melton. Bailey also conferred with the corporate discipline coordinator as well as the deputy general counsel, the corporate EEO, and the corporate director of personnel prior to recommending what, if any, disciplinary action should be taken.[3] Rader and Bailey also contacted, among others, Robert Cairn, the human resources director. The human resources department recommended that Castleberry and Melton be discharged.[4]

On August 7, 1992, Bailey and Rader met with the vice president/general manager, the

> Q: ... Do you give to your supervisors, your managers, instruction and training in the progressive discipline system?
> A: Yes, we do.
> Q: All right. And do you urge them to apply that fairly and equally and evenhandedly?
> A: Absolutely.
> Q: All right. And do you tell them that the employees are entitled to be treated, according to this discipline system, in a fair and evenhanded way?
> A: Yes.
> Q: All right. Do you expect that your managers or your supervisors will be treated any differently?
> A: No.
> (Pltfs.' Response, Nebeker Depo. at 17.) The plaintiffs' motion to strike is denied.

3. The plaintiffs move to strike the phrase "appropriate discipline" from the defendant's statement that "Bailey talked with several people before arriving at a recommendation for appropriate discipline." (Def.'s Memo., Fact No. 25; Pltfs.' Response at 19.) The plaintiffs maintain what discipline was appropriate is a fact question for a jury to determine. The plaintiffs' motion is denied. The defendant's factual statement addresses with whom Bailey conferred prior to recommending what he believed was appropriate discipline. The statement does not assert that Bailey's disciplinary recommendation was appropriate.

4. Although the human resources department also recommended that Richardson be fired, his employment was not terminated. He was given a ten-day suspension without pay and temporarily was removed from a management position at a salary reduction.

5. The plaintiffs move to strike, claiming the record does not support this statement. Although

director of operations, the director of fuselage responsibility center, the director of human resources, the deputy general counsel, and a senior personnel manager to discuss disciplinary recommendations. Those involved in deciding the disciplinary action to be taken considered the nature of the offense, the fact the dildo incident occurred after the harassment seminar and after exposure to EEO publications and sessions, and the fact the plaintiffs were longtime employees with good work histories.[5] The vice president/general manager, Gary Michaelson, described the plaintiffs' conduct as vulgar, obscene, and lacking the good judgment and common sense managers were expected to exhibit. That afternoon, the plaintiffs' employment was terminated, based upon their violation of a company rule prohibiting unacceptable conduct.[6]

Rader initially stated only the nature of the offense was considered, upon further questioning, he changed his answer. Rader was asked: "There wasn't any discussion about these being longtime employees, these being good employees, these being employees that have had good histories with us and we ought to consider that in trying to determine what we do to them?" (Pltfs.' Response, Rader Depo. at 64). Rader responded, "The answer is yes, that was discussed." (Rader Depo. at 64.) After reviewing the cited materials, this court denies the motion.

6. The plaintiffs attempt to controvert that they were discharged for unacceptable conduct. They contend "the reason for the termination is in dispute and is one of the major issues involved in this litigation." (Pltfs.' Response at 35.) Citing the defendant's response to their Interrogatory No. 4, the plaintiffs maintain Boeing acknowledged they were discharged for sexual harassment. What the plaintiffs do not mention is that Boeing timely supplemented its initial response. The supplemental answer states:

> In answering INTERROGATORY NO. 4, defendant provided a list of employees disciplined or terminated for "sexual harassment" from January 1, 1989, through December 31, 1993. Defendant clarifies what this listing represents. Employees on this list were implicated in incidents investigated as involving conduct with sexual content or overtones that could give rise to possible sex harassment allegations. Such conduct resulted in one or more complaints being lodged, an investigation being undertaken, and discipline being administered.

(Def.'s Reply, Ex. B.) Boeing has not acknowledged the plaintiffs were discharged for sexual harassment. Therefore, the plaintiffs have failed

Castleberry and Melton filed suit in state court against Boeing, alleging gender discrimination, retaliation, defamation, invasion of privacy, and breach of an implied employment contract. Boeing removed the case to federal court based upon the Title VII claims. The defendant subsequently filed this motion for summary judgment. In response, the plaintiffs concede they cannot sustain their burden of proof on the issue of retaliation and the issue of violation of the covenant of good faith and fair dealing. The remaining issues will be addressed.

## Summary Judgment

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue regarding any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must resolve all disputed facts in favor of the nonmoving party. *White v. General Motors Corp., Inc.*, 908 F.2d 669, 670 (10th Cir.1990), *cert. denied*, 498 U.S. 1069, 111 S.Ct. 788, 112 L.Ed.2d 850 (1991). The existence of some disputed facts automatically does not preclude granting summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

The moving party is entitled to judgment as a matter of law if the nonmoving party fails to make a sufficient showing of an essential element of the case for which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). One of the principal purposes of summary judgment is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows this purpose to be accomplished. *Id.* at 323–24, 106 S.Ct. at 2553. The moving party must prove entitlement to summary judgment beyond a reasonable doubt. *Norton v. Liddel*, 620 F.2d 1375, 1381 (10th Cir.1980).

to controvert that they were discharged for unac-

## Gender Discrimination

■ The plaintiffs allege gender-based disparate treatment under Title VII, 42 U.S.C. § 2000e *et seq.*, and gender discrimination under the Kansas Act Against Discrimination, K.S.A. § 44–1001 *et seq.* The same standards and legal principles govern discrimination claims pursuant to the federal and state acts. *See Best v. State Farm Mut. Auto. Ins. Co.*, 953 F.2d 1477, 1480 n. 2 (10th Cir.1991); *Beech Aircraft Corp. v. Kansas Human Rights Comm'n*, 254 Kan. 270, 272–74, 864 P.2d 1148 (1993).

■ The plaintiffs, white males, bring a "reverse discrimination" claim, which can be established by either of two methods. A plaintiff can proceed under the traditional *McDonnell Douglas* analysis, substituting the requirement that the plaintiff be a member of a protected group with evidence "the defendant is one of those unusual employers who discriminates against the majority." *Notari v. Denver Water Dep't*, 971 F.2d 585, 589 (10th Cir.1992); *see Livingston v. Roadway Express, Inc.*, 802 F.2d 1250 (10th Cir. 1986). Alternatively, a prima facie case may be shown by presentation of "direct evidence of discrimination, or indirect evidence sufficient to support a reasonable probability, that but for the plaintiff's status the challenged employment decision would have favored the plaintiff." *Notari*, 971 F.2d at 590. Under this method, the plaintiff may not rely upon the presumption of discrimination implicit in the analysis of a prima facie case under *McDonnell Douglas*.

■ The plaintiffs have elected to proceed under the latter. They maintain a jury question exists concerning whether the decision to discharge, rather than to warn or suspend, them was based upon their gender. The plaintiffs compare the treatment they received—employment terminated—with the treatment of Barr and Koester, the two women involved in the dildo incident. Barr received a five-day suspension without pay and a corrective action memo. Koester was given an oral warning for failing to report an inappropriate incident. The parties focus primarily upon Barr, presumably because

ceptable conduct.

Koester was merely the recipient of the gag gift.

Boeing argues there was no gender discrimination because Barr was not similarly situated to the plaintiffs: Castleberry and Melton were management employees; Barr was a nonmanagement employee. The defendant maintains an employer may hold its managers to a higher standard of conduct than its employees. *See Sarsha v. Sears, Roebuck & Co.,* 3 F.3d 1035, 1042 (7th Cir. 1993) (In a Title VII gender discrimination claim, the court concluded the employer was "entitled to enforce a no-dating policy ... against supervisors, who by virtue of their managerial positions are expected to know better, rather than subordinates. This court does not sit to review a company's business judgments."); *Garrett v. Parke, Davis & Co.,* 1985 WL 8053 at *3 (D.S.C.1985) (in Title VII gender discrimination claim, the plaintiff legitimately was held "to a higher standard of loyalty and cooperativeness than would be an hourly employee" because the plaintiff was in a managerial position); *see also Chamberlain v. Bissell, Inc.,* 547 F.Supp. 1067, 1078 (W.D.Mich.1982) (in age discrimination claim, the employer acted "within its legitimate prerogative in requiring higher performance standards for management personnel" than for nonmanagement personnel). This court agrees an employer may expect a higher level of conduct from management as compared to nonmanagement personnel.

Boeing also relies upon the fact the plaintiffs attended a sexual harassment seminar for managers two months before the dildo incident. Barr did not attend the same seminar.

The plaintiffs respond their discharge can be compared with Barr's discipline because their positions were "substantially similar" to the position she held and the law does not require the positions held to be identical. (Pltfs.' Response at 48.) The plaintiffs cite no case law supporting their argument that the "substantially similar" principle applies in this context.[7] Even if the principle is appli-

cable, the plaintiffs have not offered evidence concerning the substance of their job duties and of Barr's job duties. The evidence before this court is that the plaintiffs were managerial employees and Barr was not. There is no evidence the plaintiffs' positions were substantially similar to her position.

According to the plaintiffs, the Seventh Circuit's discussion of managerial versus nonmanagerial conduct in *Sarsha* should be ignored because such evidence in this case is controverted. The plaintiffs acknowledge there is evidence Boeing expected a higher standard of conduct from management. The plaintiffs then rely upon Rader's deposition testimony, which they construe as stating managerial and nonmanagerial employees will be disciplined equally. The portions of the Rader deposition shared with this court do not compare discipline between management and nonmanagement personnel. If the plaintiffs meant to reference Nebeker's deposition testimony, that matter has been addressed in footnote 2, *infra.* There is no factual dispute to preclude the grant of summary judgment.

The plaintiffs also maintain that although Barr did not attend the same harassment seminar as they did, she received sexual harassment training. Barr did receive such training, but three months after the dildo incident.

The plaintiffs next argue the reasons Boeing has given for their discharge are a pretext. The first basis for their argument is that Barr received lesser discipline. The plaintiffs stress their culpability is less than that of Barr, who instigated the dildo incident. Their second basis is grounded upon the discipline Boeing has taken in other sexual harassment or misconduct incidents. The plaintiffs assert Boeing's prior handling of such situations was more lenient, citing as examples: (1) a male supervisor who was demoted after engaging in inappropriate sexual relations with a female employee whom he supervised, and (2) employees who ex-

---

**7.** The "substantially similar" principle has been utilized in wage equity cases under the Equal Pay Act, and a more relaxed version of the principle has been employed in wage discrimination cases under Title VII. *See Meeks v. Computer Assocs.*

*Int'l,* 15 F.3d 1013, 1019–20 (11th Cir.1994); *Tidwell v. Fort Howard Corp.,* 989 F.2d 406, 409–11 (10th Cir.1993); *Baumgardner v. Roa General, Inc.,* 864 F.Supp. 1107, 1108–11 (D.Utah 1994). This is not a wage discrimination case.

posed body parts received warnings and suspensions. The plaintiffs' third basis rests upon Boeing's alleged inconsistency in stating the reason for their discharge—unacceptable conduct or sexual harassment. They maintain the latter creates a factual question precluding the grant of summary judgment.

Boeing challenges the plaintiffs' statement that they were less culpable than Barr. Barr was the instigator; however, Melton agreed to and did buy the dildo and brought it to work, and Castleberry took the dildo out of the paper sack, displayed it, and made unsuitable comments. With regard to Boeing's alleged leniency in other sexual misconduct incidents, the plaintiffs' chart of prior incidents and discipline does not include the gender of the employee disciplined. The plaintiffs point to no other similar incident involving a female manager in which the female manager was disciplined differently than the plaintiffs. Boeing also notes the female first-level manager attending the birthday celebration who failed to report the incident received the same discipline as her male counterparts who failed to report the incident. As previously addressed, the plaintiffs' third basis is not persuasive. The plaintiffs do not show Boeing's stated reason for terminating their employment was pretextual.

The plaintiffs have failed to present direct evidence or indirect evidence sufficient to support a reasonable probability of gender discrimination. The defendant's summary judgment motion is granted on the plaintiffs' gender discrimination claims brought pursuant to Title VII and the Kansas Act Against Discrimination.

### Defamation and Invasion of Privacy

The plaintiffs also bring state law claims of defamation and false light invasion of privacy. The tort of defamation, which includes slander and libel, has three elements: "(1) false and defamatory words; (2) communication to a third party; and (3) resulting harm to the reputation of the person defamed." *Batt v. Globe Eng'g Co.*, 13 Kan. App.2d 500, 504, 774 P.2d 371, *rev. denied*, 245 Kan. 782 (1989) (citations omitted); *see Woodmont Corp. v. Rockwood Ctr. Partner-*

*ship*, 811 F.Supp. 1478, 1480 (D.Kan.1993). The elements of false light, one of four types of invasion of privacy, are: "(1) publication of some kind must be made to a third party; (2) the publication must falsely represent the person; and (3) that representation must be highly offensive to a reasonable person." *Dow v. Teramara, Inc.*, No. 90–1412, 1992 WL 403093 at *8 (D.Kan.1992) (citing Restatement (Second) of Torts § 652E); *see Rinsley v. Brandt*, 700 F.2d 1304, 1307 (10th Cir.1983) (applying Kansas law); *Rinsley v. Frydman*, 221 Kan. 297 syl. 1, 559 P.2d 334 (1977); *Finlay v. Finlay*, 18 Kan.App.2d 479 syl. 4, 856 P.2d 183, *rev. denied*, 253 Kan. 857 (1993). Courts treat similarly defamation and false light invasion of privacy claims. *Booth v. Electronic Data Systems Corp.*, 799 F.Supp. 1086, 1091 (D.Kan.1992). "The false light privacy action differs from a defamation action in that injury in privacy actions is mental distress from having been exposed to public view, while the injury in defamation actions is damage to reputation." *Rinsley*, 700 F.2d at 1307; *see Froelich v. Adair*, 213 Kan. 357, 359, 516 P.2d 993 (1973). Truth and privilege are defenses available in both causes of action. *Rinsley*, 700 F.2d at 1307; *Froelich*, 213 Kan. at 359, 516 P.2d 993.

Here, the basis for the defamation and invasion of privacy claims are several meetings upper Boeing management conducted after the plaintiffs' discharge. At these meetings, the plaintiffs contend it was communicated falsely to over 250 managers and supervisors that the plaintiffs had been discharged for sexual harassment rather than for unacceptable conduct. For purposes of this motion, the defendant does not controvert the plaintiffs' version of these facts. The meetings at which the alleged statement was made were conducted during company hours on company premises. The plaintiffs do not controvert Boeing's stated purpose of the meetings, namely, to remind managers of their responsibility in eliminating inappropriate work conduct and to quell misstatements and rumors, which were running rampant throughout the plant, about the dildo incident and its repercussions.

With regard to the defamation claim, Boeing argues that the alleged statement was

not defamatory as a matter of law and that the alleged statement did not cause harm to the plaintiffs' reputations. With regard to the invasion of privacy claim, the defendant contends that the plaintiffs were not placed in a false light offensive to the reasonable person and that the plaintiffs have not claimed mental distress. Moreover, with regard to both claims, Boeing claims the alleged statement was qualifiedly privileged. The qualified privilege defense will be addressed first because the defense could shield Boeing from liability, even if the alleged statement constitutes false light invasion of privacy or defamation.

 In *Lindemuth v. Goodyear Tire & Rubber Co.*, 19 Kan.App.2d 95, 102, 864 P.2d 744 (1993), the Kansas Court of Appeals recently reviewed the law governing qualified privilege, stating:

> Employees are allowed a qualified privilege which extends protection to certain comments made within a work situation. *Luttrell [v. United Tel. System, Inc.]*, 9 Kan.App.2d [620], 622, 683 P.2d 1292 [ (1984), *aff'd*, 236 Kan. 710, 695 P.2d 1279 (1985) ].
>
> "A communication is qualifiedly privileged if it is made in good faith on any subject matter in which the person communicating has an interest, or in reference to which he has a duty, if it is made to a person having a corresponding interest or duty. The essential elements of a qualifiedly privileged communication are good faith, an interest to be upheld, a statement limited in its scope to the upholding of such interest and publication in a proper manner only to proper parties." *Luttrell*, 9 Kan.App.2d at 622 [683 P.2d 1292].
>
> . . . .
>
> When a conditional or qualified privilege exists, a plaintiff must demonstrate actual malice, requiring the plaintiff to prove that the publication was made with knowledge that the defamatory statement was false or was made with reckless disregard of whether it was false or not. *See Dobbyn v. Nelson*, 2 Kan.App.2d 358, 360, 579 P.2d 721, *aff'd* 225 Kan. 56 [587 P.2d 315] . . . (1978).

*See Polson v. Davis*, 635 F.Supp. 1130, 1148 (D.Kan.1986); *Knudsen v. Kansas Gas & Elec. Co.*, 248 Kan. 469, 479–81, 807 P.2d 71 (1991); *Turner v. Halliburton Co.*, 240 Kan. 1, 7–8, 722 P.2d 1106 (1986); *Bradford v. Mahan*, 219 Kan. 450, 456, 548 P.2d 1223 (1976); *Munsell v. Ideal Food Stores*, 208 Kan. 909, 920–21, 494 P.2d 1063 (1972). Whether a communication is privileged is a question of law. Whether actual malice or reckless disregard exists generally is a question of fact. *Turner*, 240 Kan. at 8, 722 P.2d 1106.

 The plaintiffs suggest the qualified privilege defense is not available in this case because the alleged statement was made to employees having no legitimate interest in the information. According to the plaintiffs, some of the employees at these meetings had never even worked in the same division as the plaintiffs. The plaintiffs add that quelling rumors is not a sufficient basis for disseminating the information.

Boeing disputes that the employees to whom the alleged statement was made had no interest in the information. The alleged statement concerned the basis for terminating the plaintiffs' employment. *See Munsell*, 208 Kan. at 921, 494 P.2d 1063 ("[A] communication pertaining to the reasons for discharge of a former employee is qualifiedly privileged if made in good faith by a person having a duty in the premises to one who has a similar interest therein. This is true even though the communication contains a charge of crime."). The defendant emphasizes the fact the alleged statements were directed to managers who have an interest in how company policies will be enforced. Additionally, because these managers attended the same sexual harassment seminar the plaintiffs attended, Boeing contends these managers had an interest in knowing the consequences of not following company policy pertaining to inappropriate sexual conduct. *See Turner*, 240 Kan. at 10, 722 P.2d 1106 (privileged statement only communicated to "managerial level employees with an interest in the situation"); *see also Lindemuth*, 19 Kan.App.2d at 102–03, 864 P.2d 744. The defendant also declares the large number of employees to whom the statement was made is not impor-

tant because these employees were managers who had an interest in the situation. *See High v. A.J. Harwi Hardware Co.*, 115 Kan. 400, 223 P. 264 (1924) (hardware company voluntarily circulated to its customers letter stating defamatory grounds for terminating salesman's employment; letter was qualified-ly privileged); *Burton v. Dickson*, 104 Kan. 594, 180 P. 775 (1919) (voluntary association distributed 2000 circulars to its membership concerning basis for expelling plaintiff from association; circular reached nonmembers and was basis for newspaper stories; circular found to be qualifiedly privileged).

This court finds the alleged statement was made in good faith and communicated to those who had an interest in the matter. There is no evidence the statement exceeded the scope of the interest. Therefore, this court concludes the alleged statement was qualifiedly privileged. The plaintiffs do not allege the statement was made with actual malice or with reckless disregard. Rather, they contend proof of actual malice is not needed because the qualified privilege defense is not available to the defendant. The question of malice, therefore, is not a bar to summary judgment. Because the alleged statement is qualifiedly privileged, the plaintiffs cannot prevail on their claims for defamation and false light invasion of privacy. The defendant's summary judgment motion on these claims is granted.

*Implied Employment Contract*

The plaintiffs' final claim, another state law claim, is that their discharge breached an implied employment contract, which the plaintiffs allege was created by Boeing's employee handbook, company newsletters and bulletins, company rules and regulations, training, disciplinary standards, and the company's practices and procedures. Under the plaintiffs' construction of this implied contract, Boeing agreed to discipline employees in accordance with its progressive discipline system, but failed to do so with regard to the measures taken against the plaintiffs. Under the progressive discipline system, generally, progressive steps are taken to correct a problem, e.g., oral warning, written warning, suspension, dismissal.

Each plaintiff believed he would receive an oral warning for a first offense as disciplinary action for his conduct with regard to the dildo incident. Each also believed he would be fired only if he violated a company rule.

Kansas is an employment-at-will state, meaning either the employee or the employer may terminate the employment relationship for no cause or for good cause. An exception to this doctrine is the existence of an implied contract. *Berry v. General Motors Corp.*, 838 F.Supp. 1479, 1491 (D.Kan. 1993). The Kansas Supreme Court has held that if

> ... it is alleged that an employment contract is one to be based upon the theory of "implied in fact," the understanding and intent of the parties is to be ascertained from several factors which include written or oral negotiations, the conduct of the parties from the commencement of the employment relationship, the usages of the business, the situation and objective of the parties giving rise to the relationship, the nature of the employment, and any other circumstances surrounding the employment relationship which would tend to explain or make clear the intention of the parties at the time said employment commenced.

*Dickens v. Snodgrass, Dunlap & Co.*, 255 Kan. 164 syl. 4, 872 P.2d 252 (1994); *Morriss v. Coleman Co.*, 241 Kan. 501 syl. 1, 738 P.2d 841 (1987); *see Garcia–Paz v. Swift Textiles, Inc.*, 873 F.Supp. 547 (D.Kan.1995).

The plaintiffs appear to argue the existence of an implied employment contract is a fact question never ripe for summary judgment. In support thereof, the plaintiffs rely upon *Morriss, Allegri v. Providence–St. Margaret Health Ctr.*, 9 Kan.App.2d 659, 684 P.2d 1031 (1984), and *Kistler v. Life Care Ctrs. of Am., Inc.*, 620 F.Supp. 1268 (D.Kan. 1985), cases in which a factual question on the implied contract issue precluded the grant of summary judgment. Specifically, in this case, the plaintiffs contend a reasonable factfinder could find both sides intended to be bound by this implied contract based upon the plaintiffs' expectations as long-term managerial employees, Boeing's training and written policies, Boeing's acknowledgment

that the progressive system applied to the plaintiffs, and Boeing's acknowledgement that the plaintiffs could be dismissed only for violating a company rule.

Boeing contends the only evidence to establish an implied employment contract is the plaintiffs' subjective expectations, which is not sufficient under Kansas law.

The controlling question as to whether a binding contract has been entered into depends on the intention of the parties. *Sidwell Oil & Gas Co., Inc. v. Loyd,* 230 Kan. 77, 630 P.2d 1107 (1981). In order for parties to form a binding contract, there must be what Kansas courts still sometimes refer to as a "meeting of the minds." *Id.; Care Display Inc. v. Didde–Glaser, Inc.,* 225 Kan. 232, 589 P.2d 599 (1979). Although a contract implied in fact does not involve the traditional notions of offer and acceptance, it still must represent the manifestation of mutual assent to be bound. A unilateral expectation on the part of the employee for continued employment is not sufficient. *See Conyers v. Safelite Glass Corp.,* 825 F.Supp. 974, 977 (D.Kan.1993) (citing *Copple v. City of Concordia,* 814 F.Supp. 1529, 1536–37 (D.Kan. 1993)). A reasonable person must be able to find from all relevant circumstances of the plaintiff's employment that there was an intent on behalf of both sides to be bound. *See Atchison County Farmers Union Co-op Ass'n v. Turnbull,* 241 Kan. 357, 363, 736 P.2d 917 (1987) (a mutual intent to contract must be shown for an implied contract ... to exist).

*Berry,* 838 F.Supp. at 1491–92; *see Dickens,* 255 Kan. at 173–74, 872 P.2d 252; *Johnson v. National Beef Packing Co.,* 220 Kan. 52, 55, 551 P.2d 779 (1976); *Allegri,* 9 Kan.App.2d at 664, 684 P.2d 1031; *see also Prost v. F.W. Woolworth Co.,* No. 85–2457, 1986 WL 32744 at *3 (10th Cir.1986).

Boeing acknowledges that its progressive discipline system applies to all employees and that managers are trained in the system and advised to apply such discipline in an evenhanded and fair manner. Nonetheless, the defendant maintains nothing in its employee handbook, rules and regulations, training, standards of discipline, or proce-

dures and practices indicates Boeing's intent that the progressive discipline system be mandatory in the sense some disciplinary action less than dismissal must be given for a first offense.

Boeing's Corporate Policy 8E5 sets forth the defendant's administration of discipline: Employees violating company rules, governmental security requirements, and "ordinary, reasonable, common sense rules of conduct" will be disciplined. (Def.'s Memo., Fact No. 48; Pltfs.' Response at 32.) The purpose of the discipline is to correct the matter and to avoid repetition. Considerations in determining appropriate discipline include "the seriousness of the offense, the intent and attitude of the individual, and the environment in which the offense took place." (Def.'s Memo., Fact No. 48; Pltfs.' Response at 32.)

Some willful or deliberate acts are so serious as to warrant severe discipline upon the first known offense. For these, dismissal, suspension without pay, demotion and/or reassignment may be appropriate even though no warning has been given. Other less serious situations normally will be handled under the concept of progressive discipline; that is, increasingly severe disciplinary measures will be applied for subsequent violations.

(Def.'s Memo., Fact No. 48; Pltfs.' Response at 32.) Some latitude is allowed, but "the intent is that relatively uniform disciplinary actions for similar offenses will be taken companywide." (Def.'s Memo., Fact No. 48; Pltfs.' Response at 32.) Boeing's company rules, which are published in Boeing's employee handbook, specify an employee will be disciplined for "[u]ncivil, insulting, vile or obscene language or conduct." (Def.'s Memo., Fact No. 49; Pltfs.' Response at 33.) Additionally, the employee handbook specifies:

This publication is not intended to create any contractual rights in favor of you or Boeing or to form any part of the employment relationship. It contains general statements about certain aspects of Company policy and procedure in effect as of the time of this writing. It should not be construed as a guarantee of employment

for any specific period of time, or any specific kind of work, or for any specific terms. Boeing reserves the right unilaterally to change without notice Company policy and procedure....

(Def.'s Memo., Fact No. 51: Pltfs.' Response at 34–35.) There is no evidence the employee handbook or Boeing's rules and regulations were a bargained-for aspect of the employment relationship.

Boeing declares this case is similar to *Sloan v. Boeing Co.,* No. 92–1014, 1994 WL 149197 at *12–14 (D.Kan.1994), and *Emerson v. Boeing Co.,* No. 92–1279, 1994 WL 149191 at *4–5 (D.Kan.1994), cases in which summary judgment was granted against the plaintiff. In those decisions, Judge Belot reasoned the subjective expectations of managerial employees and Boeing's employee policies, procedures, and handbook were insufficient to establish an implied employment contract.

The defendant also disputes it acknowledged the plaintiffs could be dismissed only for violating a company rule. Boeing suggests the plaintiffs have misconstrued the deposition testimony of Gary Michaelson, vice president/general manager at Wichita. According to the plaintiffs, Michaelson testified Boeing could not dismiss the plaintiffs for any reason, but only for violating company rules. The plaintiffs have oversimplified Michaelson's testimony. Michaelson was asked if he was "free" to discharge the plaintiffs "for any reason," to which he responded, "no," explaining such action would need approval from human resources and from his boss. When asked "for what reasons" he could discharge the plaintiffs, Michaelson said, "I think it has to be a violation of company rules or company conduct, expected conduct[ ] of managers." (Pltfs.' Response, Fact No. 60 & Michaelson Depo. at 50–51; Def.'s Reply at 8.)

Also telling, according to Boeing, is the fact the plaintiffs have abandoned their claim for breach of a covenant of good faith and fair dealing, a claim not available in at-will employment scenarios.

There is no objective evidence of an implied employment contract between the plaintiffs and Boeing in which the defendant intended or agreed that its progressive disciplinary system is mandatory in the sense an employee cannot be fired for a first offense. In fact, Boeing's Corporate Policy 8E5 specifically provides for such a scenario. This case falls within the distinction Judge Lungstrum outlined:

> There is a distinct difference between a policy which a given employer might adopt and sincerely intend to follow, and normally does follow, and a binding contractual duty. An employer may adopt a policy to bring clarity, or predictability, or even a sense of fairness to the employment relationship without intending to be contractually bound by it.

*Berry,* 838 F.Supp. at 1492. The defendant's motion for summary judgment on the implied contract of employment is granted.

IT IS ACCORDINGLY ORDERED this 9 day of March, 1995, that defendant Boeing's motion for summary judgment (Dkt. No. 29) is granted.