Mohammad M. SHINWARI, Plaintiff,

v.

RAYTHEON AIRCRAFT COMPANY, Defendant.

No. CIV. A. 97–2617–KHV.

United States District Court, D. Kansas.

July 23, 1998.

1310

Bobbie R. Bailey, Kansas City, MO, for Plaintiff.

Terry L. Mann, Martin, Pringle, Oliver, Wallace & Swartz, L.L.P., Wichita, KS, for Defendant.

### MEMORANDUM AND ORDER

VRATIL, District Judge.

On December 4, 1997, plaintiff filed suit against his former employer, Raytheon Aircraft Company, seeking damages for employment discrimination and retaliation in violation of 42 U.S.C. § 1981, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.,* as amended; for retaliation under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.;* and for breach of contract. This matter comes before the Court on defendant's *Motion For Partial Dismissal* (Doc. # 24) filed January 12, 1998, and defendant's *Motion For Summary Judgment* (Doc. # 62) filed April 29, 1998.

For reasons stated more fully below, the Court finds that both motions should be sustained.

### Summary Judgment Standards

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c); *accord*

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Vitkus v. Beatrice Co.*, 11 F.3d 1535, 1538–39 (10th Cir.1993). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. A "genuine" factual dispute requires more than a mere scintilla of evidence. *Id.* at 252, 106 S.Ct. 2505.

The moving party bears the initial burden of showing that there is an absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Hicks v. City of Watonga*, 942 F.2d 737, 743 (10th Cir.1991). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l, Inc. v. First Affiliated Securities, Inc.*, 912 F.2d 1238, 1241 (10th Cir.1990); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir.1991). The nonmoving party may not rest on its pleadings but must set forth specific facts. *Applied Genetics*, 912 F.2d at 1241.

"[W]e must view the record in the light most favorable to the parties opposing the motion for summary judgment." *Deepwater Invs., Ltd. v. Jackson Hole Ski Corp.*, 938 F.2d 1105, 1110 (10th Cir.1991). Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative. *Anderson*, 477 U.S. at 250–51, 106 S.Ct. 2505. "In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." *Conaway v. Smith*, 853 F.2d 789, 793 (10th Cir.1988). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it

is so one-sided that one party must prevail as a matter of law." *Anderson* at 251–52, 106 S.Ct. 2505. Ever mindful of these summary judgment standards, the Court now turns to the merits of defendant's motion.

## Introduction

Before we begin our factual discussion and analysis, we trace the various claims that plaintiff has advanced throughout the history of this dispute. We briefly summarize the chronology to determine what claims remain at this stage.

### A. EEOC Complaint

Plaintiff filed his complaint with the Equal Employment Opportunity Commission ("EEOC") on April 21, 1997. In that complaint, plaintiff checked the categories labeled "national origin," "age" and "retaliation." Plaintiff did not check the categories labeled "race" or "color." Plaintiff's written statement charged that age was the motivating factor in Raytheon's systematic demotion and/or elimination of older workers, and that Raytheon treated him unfairly and terminated him because of age and in retaliation for complaints about discrimination.[1] The written statement in support of the charge contained no reference to plaintiff's national origin. On September 5, 1997, plaintiff received the EEOC determination and Notice of Right to Sue pursuant to the ADEA.

### B. Complaint

On December 3, 1997, plaintiff filed suit. His complaint charged Raytheon with unlawful age discrimination in violation of the ADEA, and unlawful discrimination on the basis of color, race, and national origin in violation of Title VII and Section 1981. The complaint also charged Raytheon with unlawful retaliation in violation of the ADEA, Title VII, and Section 1981, and breach of an implied contract of employment.

---

1. On November 27, 1996, plaintiff sent a memorandum to Raytheon's director of Staffing and Employee Relations, in which he complained that supervisors gave him poor evaluations be-

cause of his age and national origin. Plaintiff's EEOC complaint did not describe any specific acts of discrimination which he had opposed.

## C. Pretrial Order

In the pretrial order plaintiff claimed that Raytheon discriminated and retaliated against him in violation of Section 1981 and Title VII (but not the ADEA). *Pretrial Order* (Doc. # 58) filed April 21, 1998. In support of his discrimination claims, plaintiff described his national origin as Pakistani but he did not claim to be a member of any group which was protected on the basis of race, color, or ethnicity. In support of his retaliation claims, plaintiff asserted that Raytheon fired him in response to his complaints of unlawful discrimination. Plaintiff also reiterated his claim for breach of implied contract, which he modified to include breach of express contract. Plaintiff sought damages under Title VII, Section 1981, the ADEA, and for breach of contract.

## D. Plaintiff's Opposition To Defendant's Motion For Partial Dismissal and Opposition To Defendant's Motion For Summary Judgment

In his opposition to Raytheon's motion for partial dismissal, plaintiff conceded his claim for national origin discrimination under Section 1981, as well as his claim for discrimination under the ADEA. *Plaintiff's Opposition To Defendant's Motion For Partial Dismissal* (Doc. # 32) filed January 30, 1998. In *Plaintiff's Opposition To Defendant's Motion For Summary Judgment* (Doc. # 71) filed June 1, 1998, plaintiff abandoned all of his discrimination claims, stating that "[a]t this stage, plaintiff is conceding that he was *not* the victim of unlawful discrimination, and is instead focusing on the *retaliation* that he

suffered . . . ." (emphasis in original). Plaintiff did not concede his claims for retaliation.

## E. Conclusion

■ Because plaintiff has abandoned his claim for discrimination on the basis of national origin under Section 1981, and because the pretrial order contains no allegation of discrimination on the basis of color, race, or ethnicity under Section 1981,[2] we sustain Raytheon's motion to dismiss plaintiff's Section 1981 claim in its entirety.[3]

Plaintiff has also abandoned his claim for age discrimination under the ADEA. Accordingly, we sustain defendant's motion to dismiss plaintiff's ADEA discrimination claim.

Plaintiff's sole remaining claims are that Raytheon retaliated against him for engaging in protected opposition to unlawful activity, in violation of Title VII and the ADEA, and breached his contract of employment.

### Factual Background

The following facts are uncontroverted, or where controverted, viewed in the light most favorable to plaintiff.

Plaintiff, who is Caucasian, is of Pakistani national origin. He was born on May 10, 1947, and his current age is 51. On November 1, 1993, plaintiff applied for employment with Raytheon Aircraft Company ("Raytheon"). He later received an interview with Richard Gaines. Plaintiff's approximate age and Pakistani national origin were obvious from the information he submitted, and nothing discriminatory occurred during the course of the interview. Gaines recommended that plaintiff be hired and on Febru-

---

**2.** To prove racial discrimination within the meaning of Section 1981, plaintiff must prove discrimination on the basis of ancestry or ethnic characteristics, and not solely on the place or nation of his origin. *See Saint Francis College v. Al–Khazraji,* 481 U.S. 604, 613, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987)(plaintiff must prove he was subjected to discrimination based on fact that he was born an Arab, "rather than solely on the place or nation of his origin, or his religion"); *Rawlins–Roa v. United Way of Wyandotte County, Inc.,* 977 F.Supp. 1101, 1106–7 (D.Kan.1997)(plaintiff cannot proceed on separate claims for race and national origin discrimination under Section 1981). *See also, Aramburu v. Boeing Co.,* 112 F.3d 1398, n. 2 (10th Cir.1997)

(discrimination claim based on Mexican–American ancestry fell within Section 1981's protection against racial discrimination; "Section 1981 does not protect individuals from discrimination based on national origin"); *Daemi v. Church's Fried Chicken, Inc.,* 931 F.2d 1379, 1386–87 (10th Cir.1991)(under broad concept of race under Section 1981, plaintiff of Iranian descent protected by Section 1981's bar against race discrimination).

**3.** Because plaintiff's claims for retaliation relate to opposition to discrimination on the basis of age and national origin, and not race, color, or ethnicity, plaintiff does not state a claim for retaliation under Section 1981.

ary 23, 1994, Raytheon offered plaintiff a position as a Senior Engineer at an annual salary of $48,000. This offer was $12,300 below the mid-point for Grade 9 engineers, but plaintiff's previous employer had paid him an annual salary of $47,500. Plaintiff's employment application had described his salary expectations as "negotiable" and he made no complaint about the proposed salary; in fact, Raytheon's offer was higher than any salary plaintiff had previously earned and he quickly accepted it without any attempt to negotiate a higher salary.[4] On March 9, 1994, plaintiff began work as a Grade 9 Senior Engineer.

Quite a few engineers who were significantly older than plaintiff received higher salaries than plaintiff did. Since plaintiff started work, Raytheon has hired 26 engineers (Grade 9 Senior Engineer positions) who are plaintiff's age or older. Raytheon has also hired at least 11 foreign-born Grade 9 Senior Engineers who earned more than plaintiff. One of those engineers, Mohammad Safir Ulhaque, is also of Pakistani national origin. Like plaintiff, Ulhaque worked on the Hawker program. Ulhaque received good reviews, received a promotion within a year and a half of joining the company, and received good merit increases. Plaintiff and those foreign-born engineers received salaries that were higher than those of at least 11 native-born employees who worked in the same position.

Plaintiff initially worked on the King Air, an aircraft that Raytheon had manufactured since 1964. Plaintiff reported to Gaines, whom plaintiff believed to be "a very nice person." Gaines was a Designated Engineering Representative ("DER"), which authorized him to certify that engineering work was in compliance with and acceptable to the Federal Aviation Administration ("FAA"), the federal agency which oversees the design and manufacture of aircraft.

In 1994, plaintiff received a Christmas card from Gaines and his wife. The card offended plaintiff because he does not celebrate Christmas, but he never complained and he does not know whether Gaines sent similar cards to all of his co-workers. Plaintiff does not believe that Gaines or any other supervisors discriminated against him while he worked in the King Air program.

Generally, salaried employees at Raytheon receive annual evaluations. In October of 1994, Gaines evaluated plaintiff's performance using the standard Salaried Performance Review form. The form included categories for quality of work, quantity/timeliness of work, job knowledge, initiative, attitude/effective relationships, and leadership effectiveness. Each category was susceptible of one of six ratings, ranging from "outstanding" to "unsatisfactory." Another category, safety and security, could be rated as either "acceptable" or "unacceptable." The form also included an overall performance rating and a section for comments.

In October of 1994, Gaines evaluated plaintiff as "fully competent" on all categories except attitude/effective relationships, which he graded as "above average." Plaintiff's overall performance rating was "fully competent."[5] Plaintiff made no complaint regarding the evaluation, either to his supervisors or later, in his EEOC complaint.

Early in his work for Gaines, plaintiff selected a non-standard part for one of his projects. Gaines told him to use a more common part in order to minimize costs, but plaintiff resubmitted the drawing with the same part. Gaines again marked up plaintiff's drawing, told him to use a commonly-used part, and even suggested what particular part would be appropriate. Gaines moved to another group before plaintiff's drawing was released, but he later learned that plaintiff had not made the changes and that someone else had to revise and correct plaintiff's work. Gaines did not report the

---

4. Nonetheless, plaintiff now contends that because of his age and national origin, his initial salary was not commensurate with his qualifications and education.

5. Plaintiff now contends that the review was discriminatory, in that everyone knows he is one of the best engineers in the aircraft industry. Plaintiff believes that he should have been rated as "above average" or "excellent" on quality of work, at least "excellent" on quantity of work and job knowledge, and "excellent" or "outstanding" on overall performance.

error in plaintiff's evaluation. Gaines later admitted that plaintiff's error was only a minor detail, but also noted that plaintiff refused to acknowledge that he had been wrong.

By the time of his 1995 performance review, plaintiff was reporting to Bob Pedroja, a different supervisor on the King Air program. That performance review indicated that plaintiff was "fully competent" in quality of work, quantity/timeliness of work, job knowledge, attitude/effective relationships, and leadership effectiveness, and "above average" on initiative. Plaintiff's overall performance rating was "fully competent." When plaintiff received the performance review, he told Nita Long, the director of staffing and employee relations, that he should have been rated higher. Pedroja subsequently agreed to improve the rating for attitude/effective relationships to "above average." He refused to change the other ratings.[6]

In early 1995, Raytheon began preliminary design work for what eventually became the Hawker aircraft program. Initially, Sam Bruner was the only employee who worked on the program. Other employees later joined the program and by the end of 1995, the program had 20 to 25 employees. In October of 1995, plaintiff's name appeared on a list of engineers who were going to be "offloaded" from the King Air program. Eddy Arnold, who reported directly to Bruner, was managing the air vehicle design group, which was responsible for designing the physical hardware on the aircraft.[7] Arnold reviewed the list of employees who were going to be "offloaded" and chose four persons, including plaintiff, to interview for his group. Arnold selected plaintiff because of his paper qualifications and because Gaines had told Arnold that plaintiff was capable and worked hard. The interview was suc-

cessful and plaintiff transferred to the Hawker program on November 1, 1995.

In the summer of 1996, plaintiff was required to perform certain calculations concerning the ice protection system for the Hawker aircraft. Plaintiff presented his calculations to a group of design engineers. Derek Rounds, a specialist in ice protection systems, checked plaintiff's calculations and found errors. Rounds had come from England, along with the Hawker aircraft, when Raytheon purchased it. Despite Rounds' experience and expertise with the program, plaintiff denied that he had made any errors and ignored Rounds' comments about his calculations. Gaines also checked plaintiff's work, however, and likewise found errors. Plaintiff's errors resulted from mathematical errors and incorrect assumptions which resulted from the fact that plaintiff had premised his calculations on information which was not related to the Hawker aircraft. The information which plaintiff needed to formulate accurate assumptions was readily available, however, and if Raytheon had used plaintiff's calculations, it could have chosen the wrong engine for the aircraft.[8]

In mid–1996, more people joined the Hawker program. In June of 1996, Gaines transferred to the program and became group engineer for the environmental systems and ice protection group, where plaintiff again worked for him. Arnold, however, prepared plaintiff's annual performance review for September 1996. The review noted that plaintiff needed to learn to handle constructive criticism in a manner that could lead to improved performance. In Arnold's judgment, plaintiff became defensive and stubborn if anyone criticized his work. Before putting the review in final form, Arnold discussed it with Bruner, his own supervisor. Bruner suggested adding a comment that plaintiff needed to exercise more care in reducing errors in analysis calculations. Ar-

---

6. Plaintiff's EEOC complaint did not include any allegation that the 1995 review reflected discrimination. Plaintiff now contends that he did not receive higher ratings because of discrimination.

7. Arnold, who was born on March 31, 1938, is nine years older than plaintiff.

8. Plaintiff denies that any calculation errors were serious. He notes that Gaines has stated that no one can check his own work and be 100 percent correct. Plaintiff also notes that Arnold thought he did a good job on that specification and that according to Arnold, it would be unusual for an engineer not to make mathematical errors.

nold incorporated Bruner's suggestions and gave plaintiff the performance review on September 4, 1996. The review rated plaintiff as "fully competent" in quality of work, quantity/timeliness of work, job knowledge, initiative, attitude/effective relationships, and leadership effectiveness, and "fully competent" overall. In the employee comment section, plaintiff responded that the "[a]ssigned ratings (not including ratings for 'safety and security' and 'business and ethics and conduct') are *not* commensurate with my performance" and that the ratings should have been in the " 'outstanding' to 'excellent' range."

On September 21, 1996, plaintiff complained to Long that he was dissatisfied with his annual review.[9] Four days later, on September 25, 1996, Gaines told Arnold that plaintiff was extremely difficult to deal with due to his "arrogant incompetence." At that time, Gaines had not yet assumed his role of plaintiff's supervisor, and Arnold did not document the comments in plaintiff's performance review for that year.

Art Kavie transferred to the Hawker program and became manager of the design build team in October of 1996. With this transfer, Gaines reported to Kavie and plaintiff reported to both Gaines and Kavie. When plaintiff learned that Kavie had named Gaines as lead supervisor, plaintiff complained to Kavie in a boisterous tone that Kavie could have told him earlier.

Before Kavie moved to the Hawker program, he attended a meeting where plaintiff presented certain calculations. When Kavie disagreed with plaintiff's approach and suggested the proper one, plaintiff raised his voice and appeared to Kavie to be offended.[10] In another meeting, in October of 1996, Kavie indicated his preferences regarding preparation of design drawings. Kavie claims that he had to cut plaintiff off, telling plaintiff to discuss it with Gaines later.

On October 16, 1996, plaintiff sent a memorandum to Malcolm Bowd and other managers, describing how a portion of the anti-icing system should be configured. Plaintiff did not send a copy of the memorandum to Gaines, his immediate supervisor, or to Kavie, his next-level supervisor.[11] According to Gaines, while other employees would presume that the memorandum contained the group's recommendations,[12] the recommendations in the memorandum were actually contrary to instructions which Gaines had given plaintiff.

Also in October of 1996, plaintiff had to prepare a Pressurization Control System Specification for Raytheon to send to prospective suppliers to solicit contract proposals. Plaintiff drafted the specification in such a way that only one supplier could provide the equipment. Gaines therefore instructed plaintiff to remove certain system requirements from the draft specification. Plaintiff refused to draft the specification as directed and suggested that Gaines take plaintiff's name off the specification if he insisted on the changes. Gaines had to correct and rewrite the specification himself. When Gaines notified plaintiff of the errors, plaintiff refused to change the specification.[13] Plaintiff denies that his specification con-

---

**9.** Plaintiff did not allege any discrimination.

**10.** Plaintiff purports to dispute Raytheon's version of these facts without citing any record evidence. Because plaintiff has failed to comply with D. Kan. Rule 56.1, which requires him to refer with particularity to those portions of the record upon which he relies, we deem defendant's facts to be admitted.

**11.** Plaintiff asserts that he did not send a copy to Gaines because he had previously discussed it with Gaines on several occasions and had given Gaines a detailed memorandum which Gaines threw in the trash. Plaintiff has again failed to comply with D. Kan. Rule 56.1, however, by citing deposition testimony which is not in the

record. Accordingly, we accept as true Raytheon's statement of such facts.

**12.** According to Gaines, Bowd interpreted the memorandum as a recommendation from the entire group and had serious misgivings about the features identified therein. This evidence appears to be inadmissible hearsay, however, and we do not consider it.

**13.** Plaintiff denies that he refused to comply with Gaines' request, citing his memorandum of November 27, 1996, to Gaines, Long, Bruner and Kavie. *See infra.* That document does not support plaintiff's assertion, however, and we therefore deem Raytheon's version of this fact to be admitted. *See* D. Kan. Rule 56.1.

tained *serious* errors and describes Gaines' changes as "pedantic" and mere "nomenclature." According to Gaines, the technical errors were numerous and serious.

On October 24, 1996, plaintiff sent other group members a draft memorandum on Air Conditioning Specifications without first discussing the memorandum with Gaines. At this time Gaines had not asked plaintiff to route specifications through him, but plaintiff's specifications were incompatible with the aircraft design.

Long met with plaintiff on October 23, 1996. During that meeting, plaintiff did not complain of discrimination but he again told Long that he was dissatisfied with the performance review which he had received in September. Long offered to set up a meeting with plaintiff and his supervisors. As she was in the process of doing so, plaintiff's supervisors informed her that they wanted to meet with her to discuss plaintiff's performance problems.

On November 15, 1996 plaintiff attended two separate meetings. Plaintiff first met with Long (director of staffing and employee relations), Arnold (manager of the air vehicle design group), and Bruner (Arnold's supervisor). During that meeting, plaintiff spent approximately one hour discussing his performance evaluation, hoping to persuade his supervisors to change it. Plaintiff complained that the evaluation was not commensurate with his qualifications and performance, and that it was based on discrimination. Arnold explained why he had given plaintiff the marks in each category and explained how plaintiff could improve. According to Arnold, plaintiff did not appear to want to hear what he had to say,[14] and the performance evaluation was not changed.

Immediately after the first meeting on November 15, plaintiff attended a second meeting at which Long, Bruner, Gaines and Kavie gave him a special performance review. Long and Bruner had attended the earlier meeting, when plaintiff first made verbal complaints of discrimination. The review rated plaintiff "unsatisfactory" in quality of work, quantity/timeliness of work, attitude/effective relationships and leadership effectiveness, rated him "unsatisfactory" overall, and said that he needed development in displaying initiative. Plaintiff's supervisors gave him a written memorandum which discussed these items, and asked for his response. Plaintiff responded that the special review was unjustified; that it was based on age and national origin discrimination; and that it was in retaliation for comments he had written in the employee comment section of the September review and in retaliation for his earlier complaints of discrimination to Arnold and Long.[15] Plaintiff also indicated that he would respond later, in writing.

Plaintiff's supervisors had initially planned to reconvene the discussion with plaintiff in two weeks, based on their assumption that plaintiff would respond to their concerns during the meeting on November 15. The subsequent meeting did not occur, however, because plaintiff declined to respond during the November 15 meeting.

After the meetings on November 15, plaintiff acted resentfully when Gaines tried to give him instructions and Gaines believed that plaintiff disagreed with his supervision. Kavie observed that plaintiff would not speak when he greeted plaintiff in the hallway. While Kavie never raised the issue with plaintiff, no one during his ten years of employment with Raytheon ever treated him so rudely. For his part, plaintiff believes that beginning on November 15, his managers gave him hostile treatment and excluded him from meetings he should have attended.

On November 27, 1996, plaintiff submitted a written response to the comments he had

---

14. Plaintiff denies Arnold's characterization of his demeanor, but he has not cited relevant portions of the record in support of this claim. Accordingly we deem Raytheon's version of this fact to be admitted. *See* D. Kan. Rule 56.1. Because the record reveals a recurring problem in plaintiff's presentation of the evidence, the balance of the factual statement will not document specific instances of non-compliance but will merely deem Raytheon's version of the relevant fact to be admitted where supported by record evidence.

15. Plaintiff's notes of the meeting make no mention of any such complaints.

received at the special review on November 15. Plaintiff's response—which he sent directly to Gaines, with copies to Long, Bruner, and Kavie—did not claim that Raytheon had subjected plaintiff to discrimination. It stated that plaintiff strongly disagreed with the stated reasons for the special review and discussed each of the shortcomings his supervisors had identified, dismissing them as either exaggerated or false. Plaintiff's memorandum also stated that he would work to clear up misconceptions about his work, despite his belief that he was already "in total compliance." Plaintiff's supervisors were disappointed with the attitude reflected in the memorandum, which they perceived as "I'm right, you're wrong."

When plaintiff copied his November 27 memorandum to Long, he included an attachment, addressed only to her, which stated as follows:

Dear Ms Long

As you know, I believe that my Performance Review was inaccurate.

I believe that the Special Review was done in retaliation for my having met with you and raised complaints. When I met with you about my performance review in October, I did not raise any allegations about discrimination based on my age or national origin because I did not want to belive [sic] that either of those factors might have motivated my management to treat me unfairly. Now after having had my technical competence and performance questioned by Mr. Gaines, I certainly believe that there is something more that is motivating him to treat me in this adverse manner. It appears to me that there has been an effort to eliminate older workers (of which I am one) from lead positions and to weed older workers out. I do not have any proof. I would like to have your office investigate the recent changes to my situation and to others in my department.

Mohammad M. Shinwari

This memorandum was Raytheon's first written notice that plaintiff alleged any sort of discriminatory treatment.[16] Long never showed this document to plaintiff's supervisors, and did she not discuss it with them.[17] Indeed, she did not inform anyone within the company about plaintiff's suggestion that he was being discriminated against. Furthermore, Long did not investigate the charges because she had already reviewed examples of plaintiff's poor work and had heard his supervisors describe his deficient work, attitude and behavior. Long also thought that the charges were suspicious because plaintiff had raised them only after he was in trouble for poor performance and behavior.

On December 4, 1996, plaintiff completed two projects which Gaines had assigned him on November 21, 1996. Gaines had put the assignments in writing because plaintiff had previously been unresponsive to verbal instructions. According to Gaines, the work was handwritten, nearly illegible, filled with interlineations and words that had been scribbled out, and appeared to have been hurriedly done; it would have to be entirely redone before it would be acceptable. Gaines forwarded the work to Kavie, who had wanted to assess plaintiff's capabilities. Kavie decided to redo the project himself. Kavie and Gaines could not identify other assignments that they thought plaintiff would

---

**16.** Plaintiff made such charges verbally, at the meeting with Long and his supervisors on November 15, 1997. Plaintiff "thinks" that he complained of age or national origin discrimination in the meeting with Long which occurred right after his performance review in September of 1996, *Deposition of Mohammad M. Shinwari* (Vol.I) at 683–84 (January 26, 1998), but does not recall whether he did so and his memo to Long on November 27, 1997, admits that he did not raise any allegations about discrimination at that time because he did not want to think that age or national origin discrimination might have motivated management to mistreat him.

**17.** Plaintiff denies Raytheon's evidence that Long never showed the document to plaintiff's supervisors. The evidence which plaintiff cites in support of his contention relates to an e-mail message which he sent to Long on January 13, 1997. Bruner testified that the e-mail was "the sort of thing that would probably generate some response among recipients." Such evidence does not establish a dispute whether Long showed the November 27, 1996 document to plaintiff's supervisors. For this reason, and because plaintiff lacks personal knowledge of Long's actions, we deem Raytheon's version of this fact admitted.

perform satisfactorily.[18]

In December of 1996 Raytheon provided merit increases. Plaintiff received an increase of 1.95%, or $1,000. Plaintiff alleges that his merit increase was small in retaliation for his complaints of discrimination. Plaintiff had talked about his salary with Arnold when he initially transferred to Arnold's group. Although the subject of age did not arise during the conversation, Arnold asked plaintiff why he thought he was making so little money, given his educational background, experience and performance. Plaintiff believes Arnold was implying that plaintiff's salary might be related to his age.

On January 13, 1997, plaintiff sent Long an e-mail, noting that the special performance review of November 15 had contemplated a follow-up special review within two weeks. He complained that he had received a low merit increase, that supervisors refused to give him work, that he was excluded from meetings and decisions, and that management was trying to "trap" him to do things that would jeopardize his career. Plaintiff concluded that "[i]n the light of the above I strongly believe that I am, on a regular basis, discriminated against, because of my age and other background." Long did not share this document with plaintiff's supervisors until after plaintiff's employment had been terminated.[19]

In mid-January of 1997, plaintiff's supervisors informed Long that there were continuing performance and attitude problems with plaintiff, and Kavie recommended that he be transferred. On January 15, Long contacted the Engineering Administration office and asked Jim Miller to try to find plaintiff another engineering position. Miller reported back that he could not to do so because plaintiff's prior supervisors did not want him back and other supervisors were unwilling to accept him because of his reputation for being argumentative, opinionated and unwilling to listen to the opinions of others.

As of January 17, 1997, no alternative position was available for plaintiff, and Kavie decided to terminate his employment. Kavie and Gaines prepared a special review of plaintiff's work performance, giving him an overall rating of "unsatisfactory." Comments on the special review noted the poor quality of plaintiff's work, his unwillingness to accept direction, and his unwillingness to acknowledge or correct the serious attitude problem that had been noted in the earlier special review. Raytheon presented this special review to plaintiff on January 24, 1997 and told him that he could either resign or receive involuntary termination. Plaintiff chose the latter, and Raytheon terminated his employment effective January 24, 1997, for the stated reason of deteriorating performance.

Plaintiff has admitted that he did not recall that anyone at Raytheon ever told him that he could only be terminated for good or just cause, and he believed throughout his employment that he was free to leave at any time.

### Analysis

### I. Unlawful Retaliation In Violation Of Title VII And The ADEA

As noted above, plaintiff claims that Raytheon retaliated against him for engaging in protected opposition to unlawful activity, in violation of Title VII and the ADEA. Specifically, plaintiff alleges that at the meeting on November 15, 1996, he raised the issue of unlawful discrimination with Long, Arnold and Bruner, stating that his performance evaluation "might reflect some bias on the part of management against older workers." *Pretrial Order* at 4. Plaintiff alleges that he raised the same concerns in a memorandum

---

**18.** Plaintiff notes that the project was a new concept and that his supervisors did not ask him to redo the work or give him any feedback.

**19.** Plaintiff seeks to establish a dispute whether Long provided the document to others before his termination by citing Bruner's testimony that, "[w]asn't there a letter that we got in [January] stating that he was being discriminated against on the basis of his age and I think it was national origin?" and "we received a letter in the January time frame that we all read and commented on ... " Subsequently, however, Bruner submitted deposition corrections which retracted his deposition testimony. Bruner's corrected testimony indicates that he and other supervisors did not see the January 13, 1997, e-mail before plaintiff's termination.

to Long dated November 27, 1996, in which he asked her to investigate his allegations of discrimination based on age and national origin. *Id.* Plaintiff alleges that after these communications, while he made "every reasonable attempt to keep his management informed of his work performance and progress on assigned projects," management had an extremely hostile attitude toward him. *Id.* Plaintiff asserts that later, in January of 1997, he informed Long of his belief that Raytheon was discriminating against him on the basis of age and national origin. *Id.* Plaintiff contends that in response, Raytheon further retaliated against him by preparing a special performance review to document ongoing performance problems and justify his termination on January 24, 1997.

Raytheon argues that it is entitled to summary judgment on plaintiff's retaliation claims because plaintiff had no reasonable belief that Raytheon had discriminated against him or other employees on the basis of either age or national origin; (2) plaintiff has no evidence of a causal connection between plaintiff's complaints of discrimination and any adverse action toward him; and (3) even if plaintiff has a prima facie case of actionable retaliation, he has no evidence that Raytheon's stated reasons for termination were false. Plaintiff disagrees, claiming that he had a reasonable belief that Raytheon was engaged in unlawful discrimination, that he was "essentially frozen out of his organization" after his first complaint of discrimination on November 15, 1996, and that the mere sequence of events raises an inference of retaliation. The crux of plaintiff's complaint is that Raytheon treated him differently after he made written complaints of discrimination to Long on November 27, 1996, and January 13, 1997, alleging that supervisors had given him poor evaluations because of his age and/or national origin.

In analyzing plaintiff's retaliation claims, we apply the shifting burden of proof scheme initially articulated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under this standard, if plaintiff establishes a prima facie case of

retaliation, the burden shifts to Raytheon to offer a legitimate reason for the adverse action. Once Raytheon offers such a reason, the burden shifts back to plaintiff to show that there is a genuine dispute of material fact as to whether Raytheon's proffered reason for the challenged action is pretextual. *Conner v. Schnuck Markets, Inc.,* 121 F.3d 1390, 1394 (10th Cir.1997).

Title VII and the ADEA prohibit an employer from discriminating against an employee because the employee "has opposed any practice made an unlawful employment practice" by Title VII or the ADEA. 29 U.S.C. § 623(d); 42 U.S.C. § 2000e–3(a). To establish a prima facie case of retaliation under Title VII or the ADEA, plaintiff must show (1) that he engaged in protected opposition to Title VII or ADEA discrimination; (2) that he was disadvantaged by an action of his employer subsequent to or contemporaneously with such opposition; and (3) that a causal connection exists between the protected activity and the adverse employment action.[20] *Williams v. Rice,* 983 F.2d 177, 181 (10th Cir.1993); *Dunbar v. Board of Directors of Leavenworth Public Library* 996 F.Supp. 1086, 1092 (D.Kan.1998); *Amro v. Boeing Co.,* 951 F.Supp. 1533, 1555 (D.Kan.1997).

## A. ADEA Retaliation Claim Based On Complaints Of Age Discrimination

As noted above, Raytheon argues that it is entitled to summary judgment on plaintiff's ADEA retaliation claim because (1) plaintiff had no reasonable belief that Raytheon was engaged in age discrimination; (2) plaintiff has no evidence of a causal connection between plaintiff's complaints of discrimination and any adverse action toward him; and (3) even if plaintiff had a prima facie case of actionable retaliation, he has no evidence that the stated reasons for termination were false. In its motion to dismiss, Raytheon also argues that plaintiff cannot recover punitive damages and compensatory damages under the ADEA.

**20.** We apply the same general standards of proof to ADEA retaliation claims as we do to Title VII retaliation claims. *See Anderson v. Phillips Petroleum Co.,* 861 F.2d 631, 634 (10th Cir.1988).

### 1. Protected Opposition

Plaintiff claims that he had a reasonable belief that he and other employees were subjected to age discrimination because he saw three older workers (Ted Seely, Charles Davidson and Steve Ugezene) who were passed over for lead positions or relieved of existing responsibilities; because Arnold did not allow older engineers to do presentations because he wanted to give opportunities to younger engineers; and because Raytheon brought in Gaines as plaintiff's lead even though plaintiff was already in position and was performing at a "fully competent" level. *Plaintiff's Opposition To Defendant's Motion For Summary Judgment* (Doc. # 71) filed June 1, 1998, at 38.

■ In order to establish that he engaged in protected opposition to discrimination, it is not necessary for plaintiff to prove actionable discrimination. *Love v. Re/Max of America, Inc.,* 738 F.2d 383, 384 (10th Cir.1984). To constitute protected activity, his opposition must have derived from a good faith, reasonable belief that Raytheon subjected him or other employees to discrimination. *Id.* at 385 (opposition protected when based on mistaken good faith belief that Title VII has been violated); *Plakio v. Congregational Home, Inc.,* 902 F.Supp. 1383, 1392–93 (D.Kan.1995); *Sias v. City Demonstration Agency,* 588 F.2d 692, 695 (9th Cir. 1978)(when plaintiff reasonably believes discrimination exists, opposition is protected even if plaintiff turns out to be mistaken as to facts).[21]

■ Courts have held that plaintiff's burden under this standard has both subjective and objective components: plaintiff must show not only that he subjectively believed in good faith that Raytheon engaged in unlawful discrimination, but also that his belief was objectively reasonable in light of the facts and record presented. *E.g., Little v. United Technologies, Carrier Transicold Div.,* 103 F.3d 956, 960 (11th Cir.1997)(plaintiff must do more than allege honest and bona fide belief; allegations and record must also indicate that belief, though perhaps mistaken, was objectively reasonable); *Harper v. Blockbuster Entertainment Corp.,* 139 F.3d 1385, 1388 (11th Cir.1998)(male employees could not have objectively reasonable belief that hair grooming policy constituted unlawful discrimination on basis of sex, given unanimity with which courts had declared such policies non-discriminatory); *Galdieri–Ambrosini v. National Realty & Development Corp.,* 136 F.3d 276, 292 (2d Cir.1998)(courts assess reasonableness of plaintiff's belief in light of totality of circumstances).

■ Plaintiff's professed belief that Raytheon was engaged in unlawful activity arose from the following circumstances: (1) plaintiff's belief that his 1996 performance evaluation reflected bias toward older employees; (2) Arnold's comment about plaintiff's salary; (3) the fact that "there was one time" when Arnold did not let plaintiff, Seely or Davidson participate in a presentation to "very upper management;" (4) plaintiff's belief that Seely, Davidson, Ugezene and other unidentified over–40 engineers had been demoted or relieved of leadership responsibilities; (5) the fact that Raytheon selected Gaines, rather than plaintiff, as lead engineer on the environmental control system team; and (6) a conversation where Seely told plaintiff that he was not happy with his performance evaluation.

Even if plaintiff concluded from these facts that Raytheon had engaged in age discrimination, the record reveals no genuine issue of triable fact as to the objective reasonableness and good faith of plaintiff's professed belief. At most, the record reveals that plaintiff *suspected* illegal activity or, viewed from a less charitable but perhaps more ac-

---

**21.** *See also Moyo v. Gomez,* 32 F.3d 1382, 1385 (9th Cir.1994)(erroneous belief that employer engaged in unlawful employment practice is reasonable and thus actionable under Title VII, if premised on mistake made in good faith, which may be one of fact or of law). In *Moyo,* the Ninth Circuit held that the reasonableness of plaintiff's belief that an unlawful employment practice occurred must be assessed according to an objective standard, "one that makes due allowance, moreover, for the limited knowledge possessed by most Title VII plaintiffs about the factual and legal bases of their claims." 32 F.3d at 1385–86. The *Moyo* court further noted that courts construe Title VII broadly, and that that approach is applicable to the determination whether plaintiff reasonably believed that a violation had occurred. *Id.* at 1386.

curate standpoint, that to fortify his personal position relative to Raytheon and avert his impending dismissal, plaintiff *hoped* that Raytheon had engaged in illegal activity. Plaintiff was substantially mistaken as to the factual circumstances constituting the alleged acts of discrimination, however, and this record permits no reasonable inference that his factual mistakes were either made in good faith or resulted from any objectively reasonable misunderstanding of the relevant circumstances. Even making due allowance for the fact that plaintiff may have possessed limited knowledge about the factual and legal basis for his accusations, the Court finds as a matter of law that plaintiff could not reasonably believe that the foregoing circumstances constituted unlawful activity by Raytheon.[22]

First, the record is devoid of evidence that plaintiff's performance evaluation in September of 1996 reflected bias toward older employees. Plaintiff does not recall whether he alleged age discrimination on September 21, 1996, when he complained to Long about his annual review. He did not allege age discrimination when he complained to Long on October 23, 1996. His notes of the meeting on November 15, 1996, do not support his assertion that he raised the discrimination issue during the meeting. His note to Long on November 27, 1996, admitted that he had no proof of discrimination and admitted that he did not raise any allegations about discrimination during the earlier meeting. Arnold, who as supervisor completed the performance review, was nine years older than plaintiff. The record contains no evidence that similarly-situated younger employees received higher evaluations when they performed comparable work. Indeed, plaintiff has abandoned all claims of discrimination in this case—a fact which tends to suggest that even today he lacks an objectively reasonable belief that Raytheon engaged in age discrimination against him. *See Boyd v. Runyon,* 1996 WL 294330, 3 Wage & Hour Cas.2d (BNA) 591 (D.Kan.1996)(plaintiff's opposition

to employer's activity could not be viewed as reasonable, though mistaken, allegation of violation of Title VII, because plaintiff did not allege discrimination based on sex or other protected category). Based on the evidence of record, a reasonable jury would not believe that plaintiff's performance evaluation in September of 1996 reflected bias toward older employees, or that plaintiff had a good faith, objectively reasonable belief that it did.

The same is true with respect to plaintiff's reliance on Arnold's stray question why plaintiff thought he was making so little money, given his educational background, experience and performance. While plaintiff believes that Arnold was implying that plaintiff's salary might be related to his age, the law is clear that actionable claims of discrimination cannot be premised upon stray comments. In order to rely upon age related statements, plaintiff must show that they were made by a decision-maker and that there was a nexus between the discriminatory statements and adverse action by the employer. *McKnight v. Kimberly Clark Corp.,* 149 F.3d 1125 (10th Cir.1998); *Cone v. Longmont United Hospital Ass'n,* 14 F.3d 526, 531 (10th Cir.1994). In this case, neither requirement is met. Based on the evidence of record, including the fact that Arnold is nine years plaintiff's senior, a reasonable jury would not believe that Arnold's question about plaintiff's salary reflected bias toward older employees, or that plaintiff had a good faith, objectively reasonable belief that it did.

Third, plaintiff's belief that he and older employees were not receiving the same opportunities as younger engineers—based on the "one time" when Arnold did not let plaintiff, Seely and Davidson make presentations to "very upper management"—is similarly insufficient to raise a genuine issue of material fact with respect to the bona fides of plaintiff's accusations of illegal conduct by

22. In this case, plaintiff is not entitled to any *substantial* margin for error based on a hypothesis that he had limited knowledge about the factual and legal basis for his charges of discrimination. Plaintiff consulted with an attorney before making any of his accusations, and his charges of discrimination did not present any

difficult legal concepts or require a sophisticated understanding of Title VII. Plaintiff is well educated and the record contains no basis from which a reasonable jury would conclude that his accusations involved fine legal points that were somehow beyond his ken.

Raytheon. When plaintiff asked Arnold why plaintiff could not make a presentation, Arnold replied that "he was giving an opportunity to the younger leads, and later on, then he will switch." In other words, according to plaintiff, Arnold told plaintiff that "he would give me some chance and Ted Seely some chance and Chuck Davidson some chance to make these type of presentations" but that "that time ... he is going to give those to the younger leads." *Deposition of Mohammad M. Shinwari* (Vol.I) at 444–45 (January 26, 1998). Arnold allowed Bowd, who is two years older than plaintiff, to present plaintiff's part of the project. The record does not reveal who presented the project information from Seely and Davidson. Furthermore, plaintiff cites no evidence that Arnold's explanation was untrue, in that he did not let older employees have their turn in making presentations to top management. Plaintiff cites no evidence that the presentation was inappropriately presented by younger engineers, that older engineers had insufficient opportunities for other presentations or that they suffered adverse employment consequences because Arnold cut them out of the action on this single occasion. In the circumstances, especially given the fact the Arnold is nine years older than plaintiff, a reasonable jury would not believe that Arnold's decision to let younger engineers take the lead "this one time" reflected bias toward older employees, or that plaintiff had a good faith, objectively reasonable belief that it did.

Fourth, plaintiff's mistaken belief that Seely, Davidson, Ugezene and other unidentified over–40 engineers had been demoted or relieved of leadership responsibilities cannot carry his claim of protected opposition in this case. As an initial matter, plaintiff cites no record support for his alleged belief that over–40 engineers were demoted or relieved of leadership responsibilities. The record contains no evidence that Seely, Davidson, Ugezene or any other over–40 engineers received demotions or significant reductions in leadership responsibilities. In fact it reveals that Seely, Davidson, and Ugezene consistently occupied Grade 9 engineering positions with annual salary increases. At the status conference held July 9, 1998, plaintiff's counsel admitted that Davidson, Seely and plaintiff did not receive demotions, but stated that plaintiff had believed they should have received *promotions* as more people joined the Hawker program. Plaintiff's counsel cited no record evidence that plaintiff in good faith entertained this belief, or that it was objectively reasonable in the circumstances. Plaintiff testified at his deposition that between September 6 and October 23, 1996, Kavie relieved Seely of his responsibilities as lead on the engine and power auxiliary unit and told him that Bill Burgess would take over his position. *Deposition of Mohammad M. Shinwari* (Vol.I) at 264, 525 (January 26, 1998). In fact, however, Kavie himself assumed Seely's position as lead. Kavie is older than Seely and is ten years older than plaintiff. Based on such evidence, no reasonable jury would believe that Raytheon demoted over–40 engineers or relieved them of leadership responsibilities on account of their ages, or that plaintiff had a good faith, objectively reasonable belief that it did.

Fifth, the fact that Raytheon selected Gaines rather than plaintiff as lead engineer on the environmental control system team affords an insufficient predicate for a finding of protected activity in this case. According to plaintiff, shortly after Kavie "demoted" Seely, Kavie told plaintiff that plaintiff would not be lead on the environmental control system and that he had nominated Gaines for that position. *Deposition of Mohammad M. Shinwari* (Vol.I) at 525–26 (January 26, 1998). While Gaines was younger than plaintiff and plaintiff believed that the promotion should have been his, the record compels a contrary conclusion. Gaines was a Designated Engineering Representative for the FAA. Raytheon had found him to be a very methodical, very hard worker who had done "an outstanding job" on his previous assignment. Gaines had the DER credentials to confirm his expertise in the area, and the undisputed fact is that those two things "set him above the rest of the other individuals in the [environmental systems] group," so that he was "the logical choice" for lead engineer. The record does not reflect that plaintiff had comparable credentials or expertise. In the face of such evidence, no reasonable jury would believe that Raytheon refused to promote

plaintiff over Gaines on account of his age, or that plaintiff had a good faith, objectively reasonable belief that it did.

Finally, plaintiff's belief that Seely was unhappy with a performance evaluation does not provide a sufficient predicate for a finding of protected activity in this case. The evidence on this point is hearsay, and the record contains no evidence that Seely himself attributed the evaluation to age discrimination. Indeed, while Seely wrote Arnold and Bruner a memo which reflected his disagreement with their evaluation, he did not attribute any part of his disagreement to age discrimination. The record contains no information concerning how Seely's evaluation compared to the evaluations of similarly-situated younger employees, and a reasonable person would not conclude from the naked fact that Seely was in a protected age group that an adverse evaluation must be the result of age discrimination. In summary, no reasonable jury would believe that Raytheon gave Seely a bad evaluation on account of his age, or that plaintiff had a good faith, objectively reasonable belief that it did.

Although opposition activity is protected when based on a mistaken belief that Title VII has been violated, *Love*, 738 F.2d at 385, that belief must be in good faith and reasonable. *Id.* In this case, however, the record is devoid of evidence that plaintiff's view of the facts was reasonable, though wrong. The record tells us nothing about the sources of plaintiff's factual information, the extent of his inquiry or investigation, or why plaintiff misapprehended such basic points as the fact that Seely, Davidson and Ugezene were not demoted, that Seely's responsibilities were assumed by someone older than Seely, that someone older than plaintiff presented his project to top management, and so forth. Nor does the record suggest that plaintiff made a good faith and reasonable mistake in drawing the legal conclusion that Raytheon had violated the ADEA. In order to justify a finding of objective reasonableness, the record must establish facts which suggest that a reasonable person in plaintiff's position would

believe that defendant had engaged in illegal activity. The record in this case does not do so. In fact, the only permissible inference which reasonably flows from this record is that plaintiff manufactured a charge of discrimination to deflect attention from his own performance problems.

In summary, assessing the reasonableness and good faith of plaintiff's belief in light of the totality of the circumstances, *Galdieri–Ambrosini*, 136 F.3d at 292, the Court finds as a matter of law that no reasonable jury would conclude that plaintiff had an objectively reasonable belief that Raytheon had engaged in unlawful activity at the time he opposed the alleged discrimination. Accordingly, plaintiff has failed to establish the first element of his prima facie case for retaliation, in violation of the ADEA.[23]

### 2. Causal Connection

Raytheon does not dispute that plaintiff suffered adverse action. Accordingly, we turn to the remaining element of plaintiff's prima facie case of retaliation, whether a causal connection exists between the protected activity and the adverse employment action.

The Tenth Circuit has held that "[t]he causal connection may be demonstrated by evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." *Conner*, 121 F.3d at 1395 (citing *Burrus v. United Tel. Co. of Kansas, Inc.*, 683 F.2d 339, 343 (10th Cir.), *cert. denied*, 459 U.S. 1071, 103 S.Ct. 491, 74 L.Ed.2d 633 (1982) ). Under that standard, a four-month time lag between participation in protected activity and termination by itself is not sufficient to justify an inference of causation. *Id.* Nor is a three-month period sufficient. *See Richmond v. ONEOK, Inc.*, 120 F.3d 205, 208 (10th Cir.1997); *see also Butler v. City Of Prairie Village*, 974 F.Supp. 1386, 1398 (D.Kan.1997)(temporal proximity of between one and four months insufficient to raise inference of retaliation). A two-hour gap, on the other hand, would be

---

**23.** We further find that Raytheon has articulated a legitimate reason for the employment action taken and that plaintiff cannot point to evidence that Raytheon's reason was merely pretextual. *See* analysis, pt. B.3, *infra*.

sufficient. *See Love,* 738 F.2d at 386. A two-day gap would also suffice. *See Hansen v. Alta Ski Lifts Co.,* 141 F.3d 1184, 1998 WL 161147, *3 (10th Cir.1998) (Table)(citing *Sauers v. Salt Lake County,* 1 F.3d 1122, 1128 (10th Cir.1993)).

In *Marx v. Schnuck Markets, Inc.,* 76 F.3d 324, 329 (10th Cir.), *cert. denied,* 518 U.S. 1019, 116 S.Ct. 2552, 135 L.Ed.2d 1071 (1996), the Tenth Circuit held that a plaintiff made a sufficient prima facie showing of causation to avoid summary judgment when he showed that shortly after filing an FLSA complaint, his employer began a pattern of retaliatory conduct related to his FLSA conduct, even though the employer did not finally terminate him until much later. In this case, plaintiff alleges that retaliation began immediately after his first verbal protest of unlawful activity during the meeting on November 15, 1996, and culminated two months later in termination. Were we to reach this issue, we would conclude that plaintiff has established conduct closely followed by adverse action, a circumstance which would justify an inference of retaliatory motive.

Given our finding that plaintiff has failed to prove the protected activity element of his prima facie case, plaintiff's success on this point is moot.

### 3. Punitive Damages

Raytheon argues in its motion to dismiss that punitive damages and compensatory damages for pain and suffering are not recoverable under the ADEA. Raytheon addresses this argument solely to plaintiff's claim for discrimination under the ADEA, but we assume that it also encompasses plaintiff's claim for retaliation under the ADEA.

■ Plaintiff concedes that he is not entitled to compensatory and punitive damages on his ADEA discrimination claim, but he apparently argues that he is entitled to compensatory and punitive damages for *retaliation* under the ADEA. In this regard, he states as follows:

plaintiff will agree to strike those portions of [the ADEA discrimination claim] which appear to seek relief in the form of com-

pensatory damages and punitive damages with the exception of liquidated damages.... The plaintiff strongly believes that he is entitled to compensatory damages under [the ADEA retaliation claim]. The plaintiff's concession should not be construed as relating to his allegation of unlawful *retaliation* under the ADEA.

*Plaintiff's Opposition To Defendant's Motion For Partial Dismissal* (Doc. # 32) filed January 30, 1998, at 2 (emphasis in original). In the pretrial order, plaintiff contends that he is entitled to punitive damages for retaliation under the ADEA upon a showing that Raytheon acted with malice or with reckless indifference to his federally protected rights.

The ADEA provides in pertinent part as follows:

Amounts owing to a person as a result of a violation of this Act shall be deemed to be unpaid minimum wages or unpaid overtime compensation for purposes of [the Fair Labor Standards Act]: Provided, that liquidated damages shall be payable only in cases of willful violations of this Act.

29 U.S.C. § 626(b). The Tenth Circuit has held that punitive damages are not recoverable under the ADEA. *See Bruno v. Western Elec. Co.,* 829 F.2d 957, 967 (10th Cir.1987). Moreover, while the ADEA is silent on the question, the Tenth Circuit has held that it does not authorize recovery of compensatory damages. *Perrell v. Financeamerica Corp.* 726 F.2d 654, 655 (10th Cir.1984). Plaintiff therefore may not recover punitive damages or compensatory damages for pain and suffering under his ADEA retaliation claim.

Accordingly, the Court finds that Raytheon's motion to dismiss plaintiff's claim for punitive and compensatory damages for retaliation under the ADEA must be sustained.

### B. Title VII Claims of Retaliation Based On Complaints Of National Origin Discrimination

For reasons that are not apparent, the parties have not proffered detailed arguments addressed to plaintiff's retaliation claim under Title VII. As noted above, Raytheon argues that it is entitled to summary judgment on plaintiff's claim for retaliation in

violation of Title VII because (1) plaintiff had no reasonable belief that Raytheon was engaged in national origin discrimination; (2) plaintiff has no evidence of a causal connection between his complaints of discrimination and any adverse action toward him; and (3) even if plaintiff has a prima facie case of actionable retaliation, he has no evidence that Raytheon's stated reasons for his termination were false. Raytheon cites few facts which are pertinent to plaintiff's charge of national origin discrimination, however, and plaintiff does not address the Title VII retaliation issue at all.[24]

### 1. Protected Opposition

Despite plaintiff's failure to respond to Raytheon's arguments in support of summary judgment on this issue, we cannot sustain Raytheon's motion regarding protected opposition because Raytheon has failed to establish its entitlement to judgment as a matter of law. *See* Fed.R.Civ.P. 56(e) (if adverse party does not respond, summary judgment, *if appropriate*, may issue). Raytheon argues that plaintiff did not engage in protected opposition to national origin discrimination because his retaliation claim came only after his supervisors criticized his performance, after they told him to leave meetings to which he was not invited, and after plaintiff argued with his supervisors and others and disobeyed orders from supervisors. Raytheon also argues that plaintiff, after consulting with counsel, made a baseless and unfounded allegation in an effort "to intimidate Raytheon into retaining an incompetent, rude, and arrogant employee." While these facts may give rise to an inference that plaintiff's complaint of national origin discrimination was not reasonable, they are insufficient to establish Raytheon's entitlement to judgment as a matter of law. Raytheon's arguments do not address any facts which are specific to plaintiff's retaliation claim under Title VII; instead, they merely summarize Raytheon's arguments against plaintiff's ADEA retaliation claim.

### 2. Causal Connection

Raytheon's sole argument against the causal connection element of plaintiff's claim is that "[a]fter he had been sternly warned about his performance and attitude, plaintiff turned in work that was far below the quality of prior work" his supervisors had previously criticized, and that "[p]laintiff, who has many years of experience with a large number of employers, certainly had to know that his supervisors would find his work unacceptable." Again, Raytheon's arguments do not address any specific facts pertinent to plaintiff's claim of retaliation based on complaints of national origin discrimination.

Raytheon's arguments against plaintiff's prima facie case of retaliation under Title VII may eventually carry the day. At this point, however, for reasons discussed in connection with plaintiff's claim of retaliation under the ADEA, we cannot conclude that summary judgment is appropriate for Raytheon on this issue.

### 3. Raytheon's Asserted Reasons For Its Action

Once plaintiff establishes a prima facie case, the burden shifts to Raytheon to set forth reasons for its action which, if taken as true, would permit the conclusion that there was a nondiscriminatory reason for its action. *Conner,* 121 F.3d at 1394; *Forsythe v. Board of Educ. of U.S.D. No.489,* 956 F.Supp. 927, 932 (D.Kan.1997). Raytheon argues that even if plaintiff were able to establish a prima facie case of retaliation, it had legitimate reasons for its treatment of plaintiff. Raytheon asserts that plaintiff's performance review of 1996 reflects his inaccurate work and his tendency to argue with those who disagreed with his work; that the special review on November 15, 1996, resulted from plaintiff's refusal to obey his superiors, his lack of teamwork, and his failure to treat others courteously; and that after the meet-

---

**24.** Plaintiff makes one passing reference to the national origin aspect of his retaliation claim in his argument that "when plaintiff made his first written complaint to Long ... [h]e admitted that he does not know the ages of most of the engi- neers working with him and he does not know what their national origins are." *Plaintiff's Opposition To Defendant's Motion For Summary Judgment,* (Doc. # 71) filed June 1, 1998, at 39.

ing on November 15, 1996, the quality of plaintiff's work was poor, his supervisors could find no assignments that they believed he could perform, and other departments expressed no interest in working with him.

Plaintiff responds that he has a solid work history; that Gaines believed he was capable and worked hard; that three different supervisors had given him "fully competent" ratings for three consecutive years; that Arnold believed that he was technically competent and would have supervised him again; and that Kavie recommended that he be transferred to another position before he eventually decided to fire him. He also argues that "the fact that Long is blatantly lying about not telling plaintiff's management that he had complained of discrimination" gives rise to an inference of discrimination.[25] Finally, plaintiff asserts that questions about his work performance are simply questions of fact which the jury must decide.

On this record we conclude as a matter of law that Raytheon had legitimate reasons for any identified adverse treatment of plaintiff. Between November 15, 1996, and plaintiff's termination on January 24, 1997, plaintiff received two unfavorable performance reviews. It is undisputed that plaintiff's supervisors believed he had a negative attitude, which they perceived as "I'm right, you're wrong"; that they perceived his work to be poor; that they found errors in his calculations; that plaintiff acted resentfully when Gaines tried to give him instructions; that Gaines believed that plaintiff disagreed with Gaines' supervision; and that Gaines told Arnold that plaintiff was extremely difficult to deal with due to his "arrogant incompetence." It is undisputed that plaintiff sent out a memorandum which contained recommendations that were contrary to the instructions which Gaines had given him; that he completed two projects in a manner that Gaines found unacceptable; and that Gaines and Kavie could not identify other assignments that they thought plaintiff would perform satisfactorily. Furthermore, Long did not investigate plaintiff's discrimination charges because she had already reviewed examples of his poor work and had heard his supervisors describe negatively his work, attitude, and behavior. Eleven foreign-born Grade 9 Senior Engineers earned more than plaintiff, and these engineers (like plaintiff) earned more than at least 11 other native-born engineers in the same position. Ul-haque, another employee of Pakistani national origin assigned to the Hawker program, did not receive poor evaluations or low merit increases. Plaintiff does not dispute these facts, and they are not materially undercut by the fact that plaintiff had previously received positive reviews.

Once Raytheon offers a legitimate reason for its action, the burden shifts back to plaintiff to show that there is a genuine dispute of material fact as to whether Raytheon's proffered reason for the challenged action is pretextual. *Conner*, 121 F.3d at 1394. To avoid summary judgment at this stage, plaintiff is required to produce evidence that the adverse action was in retaliation for his protected activity, either through the use of direct evidence or by showing that Raytheon's proffered non-retaliatory reasons for its action were pretextual. *Id.* at 1396. Pretext may be established by showing either "that a discriminatory reason more likely motivated the employer or ... that the employer's proffered reason is unworthy of credence." *Rea v. Martin Marietta Corp.*, 29 F.3d 1450, 1455 (10th Cir.1994)(quoting *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). Where as here plaintiff seeks to demonstrate that the employer's explanation is merely a pretext, the Court requires a showing that "the tendered reason for the employment decision was not the genuine motivating reason, but rather was a disingenuous or sham reason." *Reynolds v. School District No. 1 Denver*, 69 F.3d 1523, 1535 (10th Cir.1995). Accordingly, plaintiff must produce evidence from which a reasonable jury could believe that Raytheon's proffered reason is a false

---

**25.** Plaintiff bases this argument on Bruner's deposition testimony. However, Bruner has submitted corrections which retracted the relevant portions of the deposition testimony upon which plaintiff relies. *See* note 19, *supra.* Accordingly, there is no record support for plaintiff's argument that Long was untruthful. *See* analysis, *supra.*

one in order to survive summary judgment. *Id.*

Plaintiff argues that any errors occurred in the preliminary stages of developing a new aircraft, at a time when the department was undermanned. He argues that the errors were "not serious enough" for Arnold to down-grade his 1996 performance review; that Arnold gave him a "fully competent" rating on his 1996 review; that he received no assignments after November 27, 1996; and that Raytheon terminated his employment after he complained of discrimination on January 13, 1997. Plaintiff argues that the record reveals disputed questions of fact concerning his work assignments and his supervisors' attempts to transfer him, and that such facts should be "unraveled" by a jury.

Raytheon acknowledges plaintiff's *belief* that his performance was consistently outstanding, but argues that plaintiff's self-appraisals of performance do not create a genuine issue of material fact. *See Forsythe,* 956 F.Supp. at 934 (plaintiff's self-appraisal of job skills does not create genuine issue of material fact)(quoting *Schultz v. General Elec. Capital Corp.,* 37 F.3d 329, 334 (7th Cir.1994)(employee's own self-serving remarks standing alone insufficient to raise doubts as to credence of employer's explanation for termination)); *Furr v. Seagate Technology, Inc.,* 82 F.3d 980, 988 (10th Cir.1996)(manager's perception of employee's performance is relevant, while plaintiff's subjective evaluation of his own relative performance is not). Raytheon further argues that its treatment of Ulhaque, another Hawker aircraft employee of Pakistani national origin, negates plaintiff's pretext argument. According to Raytheon, its treatment of Ulhaque proves that it had no bias against foreign-born engineers, including those born in Pakistan.

Plaintiff has failed to establish genuine issues of material fact whether Raytheon's articulated reasons for its action were pretextual. The Tenth Circuit Court of Appeals has recognized that summary judgment is not ordinarily appropriate for settling issues of intent or motivation. *Setliff v. Memorial Hosp. of Sheridan County,* 850 F.2d 1384, 1394, n. 12 (10th Cir.1988). However, in this case, the record does not reveal that at the time of his termination (or at the time of any earlier adverse action) there was any dispute or a genuine issue concerning the sincerity of Raytheon's proffered reasons. In this case the totality of plaintiff's proffered evidence is insufficient to raise a genuine doubt about Raytheon's motivation. The test is good faith belief. *McKnight,* 149 F.3d 1125; *Reynolds,* 69 F.3d at 1535.

Based upon the foregoing, this Court finds no genuine issue of material fact whether Raytheon's stated reasons for termination were pretextual. While plaintiff believes that he is a very good engineer, plaintiff does not deny that he committed errors and that his supervisors had lost confidence in his ability to perform. Accordingly, we find that Raytheon is entitled to summary judgment on plaintiff's claim for national origin retaliation under Title VII.[26]

## II. Breach Of Contract

While plaintiff has opposed defendant's motion to dismiss his contract claims, his opposition is moot in view of the fact that he has not opposed Raytheon's motion for summary judgment on the claims for breach of implied and express contract. Because plaintiff has not opposed Raytheon's motion for summary judgment, we could find that plaintiff has abandoned his contract claims and grant summary judgment for Raytheon on that ground. *See* Fed.R.Civ.P. 56(e)(if adverse party does not respond, summary judgment, if appropriate, may issue). Even if plaintiff had fully responded, however, summary judgment would be appropriate. The record contains no support for any find-

**26.** While the pretrial order contains loose language which alleges that Raytheon retaliated against plaintiff by assorted varieties of adverse employment action prior to dismissal, the summary judgment briefs do not address that issue in any meaningful way. The Court therefore assumes that plaintiff's claim is limited to retaliation based on the termination of employment on January 24, 1997, and that he has waived any claims of retaliation based on the fact that prior to termination he was excluded from meetings, treated in a hostile manner, and so forth.

**1328**

ing that plaintiff had a contract of employment, either express or implied.[27]

Kansas adheres to the common law doctrine of employment-at-will. *Ramirez v. IBP, Inc.*, 913 F.Supp. 1421, 1428 (D.Kan.1995). Under that doctrine, employees are considered at-will employees unless there is an express or implied contract of employment. *Anglemyer v. Hamilton County Hosp.*, 58 F.3d 533, 537 (10th Cir.1995). In the absence of a contract governing the duration of employment, the employment is terminable at the will of either party. *Dickens v. Snodgrass, Dunlap & Co.*, 255 Kan. 164, 172, 872 P.2d 252, 259 (1994).

Under Kansas law, the intent of the contracting parties is normally a question of fact for the jury, and determination of whether there is an implied contract in employment requires a factual inquiry. *Boyd v. Doskocil Sausage Co.*, 686 F.Supp. 875, 877 (D.Kan.1988); *Morriss v. Coleman Co.*, 241 Kan. 501, 512, 738 P.2d 841, 848 (1987). This Court has previously noted that summary judgment may be appropriate when plaintiff's unilateral expectation of continued employment is the only basis for the alleged implied contract. *Garcia–Harding v. Bank Midwest, N.A.*, 964 F.Supp. 1492, 1511 (D.Kan.1997).

The ultimate issue in determining the existence of an implied-in-fact contract is whether the totality of the circumstances supports a finding that the parties objectively manifested their intent to alter the at-will employment relationship. *Garcia–Harding*, 964 F.Supp. at 1512. The factors to be considered in making such a determination include the understanding and intent of the parties, the conduct of the parties, the usages of the business, the situation and objective of the parties giving rise to the relationship, the nature of the employment,

and any other circumstances surrounding the employment relationship which would tend to make clear the intention of the parties at the time the employment relationship commenced. *Anglemyer*, 58 F.3d at 537; *Enstrom v. Beech Aircraft Corp.*, 712 F.Supp. 841 (D.Kan.1989); *Morriss*, 241 Kan. at 513, 738 P.2d at 848–49. Similarly, no express contract of employment exists without an agreed-upon statement as to the specific duration of employment. *O'Loughlin v. Pritchard Corp.*, 972 F.Supp. 1352, 1368 (D.Kan. 1997).

Plaintiff argues that Raytheon cannot secure dismissal under *Castleberry v. Boeing Co.*, 880 F.Supp. 1435 (D.Kan.1995), because that case was decided on summary judgment. There, the court granted summary judgment on plaintiff's breach of contract claim because plaintiff had not produced evidence to support his allegation that defendant had intended to enter a contract for continued employment or to modify the at-will employment relationship. *Id.* at 1445. Raytheon has addressed the contract issues in a summary judgment context. As noted above, plaintiff had the opportunity to respond to Raytheon's motion, but he did not do so. Accordingly, our reliance upon *Castleberry* is entirely appropriate.[28]

In this case, the summary judgment record is devoid of evidence that plaintiff relied on any Raytheon policy or practice to refrain from firing employees except for good cause. Likewise the record contains no evidence that Raytheon communicated to plaintiff, at any time during his employment, any policy not to fire employees except for good cause. Indeed, plaintiff has admitted that no one at Raytheon ever told him that he could only be terminated for good or just cause, and he believed throughout his employment that he was free to leave at any time. The fact that

**27.** Raytheon's motion for partial dismissal addressed plaintiff's breach of implied contract claim. Subsequent to that motion, plaintiff modified his contract claim to include a claim for breach of express contract. *See Pretrial Order* (Doc. # 58) filed April 21, 1998, at 11–12. Raytheon then addressed both contract claims in its motion for summary judgment. Because plaintiff did not respond to Raytheon's summary judgment arguments on the contract issues, we look to plaintiff's arguments in opposition to Raytheon's motion for partial dismissal.

**28.** To the extent that we rely on any arguments contained in Raytheon's motion for partial dismissal that are not contained in the motion for summary judgment, we construe the motion for partial dismissal as a motion for summary judgment. *See* Fed.R.Civ.P. 12(c).

his supervisors indicated that they would work with him to improve his performance does not support a finding that plaintiff and Raytheon objectively manifested their intent to alter the at-will employment relationship. In light of these undisputed facts, plaintiff cannot establish the existence of an implied contract of employment. Accordingly, Raytheon is entitled to summary judgment on plaintiff's claim for breach of implied contract.

Likewise, the summary judgment record is devoid of any evidence of an agreed-upon statement concerning the duration of plaintiff's employment. Therefore plaintiff cannot establish the existence of an express contract of employment. Accordingly, Raytheon is also entitled to summary judgment on plaintiff's claim for breach of express contract.

**IT IS THEREFORE ORDERED** that defendant's *Motion For Partial Dismissal* (Doc. # 24) filed January 12, 1998, be and hereby is **SUSTAINED.**

**IT IS FURTHER ORDERED** that defendant's *Motion For Summary Judgment* (Doc. # 62) filed April 29, 1998, be and hereby is **SUSTAINED.**